720 So.2d 425 (1998)
Madeline MOORE, Plaintiff-Appellant,
v.
WILLIS-KNIGHTON MEDICAL CENTER, et al., Defendant-Appellee.
No. 31203-CA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1998.
*426 Edmund M. Thomas, Benjamin P. Mouton, Baton Rouge, for Plaintiff-Appellant.
Cook, Yancey, King & Galloway by Lisa Dunn Folsom, Shreveport, for Defendant-Appellee.
Before HIGHTOWER, GASKINS and PEATROSS, JJ.
GASKINS, Judge.
The plaintiff, Madeline Moore, appeals from a jury verdict rejecting her claim that the defendant, Willis-Knighton Medical Center, was negligent in issuing her a toilet seat to use at home while recuperating from right hip repair surgery which did not clamp down on the toilet. Two months after her discharge, the plaintiff claims the toilet seat *427 slipped during use and the plaintiff fell, breaking her left hip. For the following reasons, we affirm the jury verdict and trial court judgment.

FACTS
In 1984 the plaintiff was 67 years old and was employed as a salesperson in a local millinery shop. In December of that year, she slipped and fell at work, breaking her right hip. The plaintiff was hospitalized and the hip was surgically repaired by Dr. M.E. Milstead. On December 18, 1984, she was released from the hospital. Because Dr. Milstead was not on duty, his colleague, Dr. Lewis Jones, discharged the plaintiff from the hospital. Dr. Jones, who had also treated the plaintiff in the past, ordered an elevated toilet seat to be sent home with the plaintiff. The hospital supplied the plaintiff with a toilet seat like the one she used in the hospital. The device was designed to raise the normal level of the toilet seat in order to lessen the strain on a joint post-operatively. The seat had metal extensions that pressed down onto the rim of the bowl, but it did not clamp down. It was delivered to the plaintiff in a box and under the bottom of the toilet seat was the following warning:
This product is designed to safely support 250 lbs. When weight exceeds this, transfer patients, or when patients with balance problems are involved, "CLAMP LEG" models should be used. SIDE RAILS are also recommended for certain conditions. CAUTION: Patient should never be left alone when using this device.
Due to complications with the healing process, Mrs. Moore was initially told not to place weight on the right foot and shortly thereafter, she was told to only use toe touch weight bearing on her right side and to continue to use her walker. On February 26, 1985, while at home alone, she attempted to use the elevated toilet seat and she claims that the seat tipped with her and she fell, breaking her left hip. She was again hospitalized and the left hip was surgically repaired by Dr. Jones.
On May 1, 1985, Dr. Jones deemed the plaintiff to be sufficiently recovered from the right hip injury to return to work. However, she was still being treated for the left hip and did not return to work. The plaintiff continued to see Dr. Jones for pain in her left hip until June 18, 1985. At that point Dr. Jones released the plaintiff from his care and felt that she could have returned to work in September or October of 1985. The plaintiff claims that as a result of the second hip injury, she never recovered sufficiently to return to work and she required assistance in cooking, cleaning, and bathing. However, with assistance, she was able to live at home alone for ten years after this injury.
The plaintiff contended that the toilet seat given her was designed to be used only by persons who required no assistance in walking and not by those with balance problems. She asserted that, because her right hip was still healing, requiring the continued use of a walker, she had a mechanical balance problem. She further asserted that she received either no instructions or incorrect instructions in the hospital in the use of the walker in conjunction with the toilet seat and that she received no instructions in the use of the walker and toilet seat upon her release from the hospital. She contended that Dr. Jones and Willis-Knighton Medical Center were negligent in providing her with a commode extension not designed for her type of disability, in failing to warn of the instability of the extension and in failing to instruct her or instructing her improperly in its use.
A medical review panel was convened and on February 6, 1989 determined that the evidence did not show that Dr. Jones or Willis-Knighton Medical Center failed to meet the applicable standard of care. The plaintiff then filed suit in district court on May 5, 1989, naming Dr. Jones and Willis-Knighton Medical Center as defendants. The plaintiff reached an agreement with Willis-Knighton to accept $75,000.00 and half the costs in settlement of all her claims against the hospital, reserving her right to seek damages in excess of the sum paid by Willis-Knighton from the Louisiana Patients' Compensation Fund and Dr. Jones. However, under the terms of the agreement, Willis-Knighton was required to remain in the case as a nominal defendant. Accordingly, Willis-Knighton was represented at trial by the *428 Louisiana Patient's Compensation Fund and Oversight Board. Dr. Jones was dismissed from the suit after jury selection, but before the testimony began.
The case was tried before a jury. On July 11, 1997, the jury returned a 9-3 verdict finding that Willis-Knighton did not breach the standard of care owed by the hospital to the plaintiff in this case. The plaintiff filed motions for judgment notwithstanding the verdict and for new trial which were denied by the trial court. The plaintiff then appealed the jury verdict.

ARGUMENTS ON APPEAL
The plaintiff first argues that the jury erred as a matter of law in finding that the hospital did not breach the standard of care owned to her. Mrs. Moore contends that the jury failed to apply the national standard of care as instructed by the trial court and, instead, applied Willis-Knighton's own standard of care to the facts presented. The plaintiff contends that she presented ample uncontradicted evidence that the applicable standard of care was breached in her case. The plaintiff argues that she established that she was given a toilet seat extension not appropriate for a person with her disability. She also claims that she received erroneous instructions from the nursing staff to place her weight completely on the walker while sitting and rising. She further claims that the hospital records show that on discharge, she was given no instructions on the use of the toilet seat extension.
The plaintiff urges that, because the jury failed to apply the law as instructed, the jury erred as a matter of law in denying her claim and this court should reverse the verdict and conduct a de novo review. The plaintiff asserts that on de novo review, we should make determinations as to causation and comparative fault and should award her damages.

Legal Principles
Malpractice claims against a hospital are subject to the general rules of proof applicable to any negligence action. A plaintiff must prove that the defendant had a duty to protect against the risk involved, that the defendant breached its duty and that the plaintiff's injury was caused by the defendant's conduct. Smith v. State, through Department of Health and Human Resources, 523 So.2d 815 (La.1988); Roberts v. Cox, 28,094 (La.App.2d Cir.2/28/96), 669 So.2d 633. However, a hospital is not an insurer of a patient's safety and is not required to guard against or take measures to avert a situation which a reasonable person would not anticipate as likely to happen under the given circumstances. Bossier v. DeSoto General Hospital, 442 So.2d 485 (La.App. 2d Cir. 1983), writ denied 443 So.2d 1122 (La.1984). The mere fact that an injury occurs or an accident happens raises no presumption or inference of negligence on the part of the hospital. Galloway v. Baton Rouge General Hospital, 602 So.2d 1003 (La.1992).
Hospitals are held to a national standard of care. The locality rule does not apply to hospitals. Keyworth v. Southern Baptist Hospitals, Inc., 491 So.2d 15 (La. 1986). Hospitals are bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974); Borne v. St. Francis Medical Center, 26,940 (La.App.2d Cir.5/10/95), 655 So.2d 597, writ denied 95-1403 (La.9/15/95), 660 So.2d 453; Parker v. Centenary Heritage Manor Nursing Home, 28,401 (La.App.2d Cir.6/26/96), 677 So.2d 568, writ denied 96-1960 (La.11/1/96), 681 So.2d 1271. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the facts and circumstances of the case and is a question of fact for the jury. Borne v. St. Francis Medical Center, supra. In finding or refusing to find a breach of duty, the finder of fact has great discretion. Borne v. St. Francis Medical Center, supra; Parker v. Centenary Heritage Manor Nursing Home, supra.
In a medical malpractice case, a reviewing court will give great deference to a jury's findings when medical experts express *429 different views, judgments and opinions on whether the standard of care was met in any given case. Maxwell v. Soileau, 561 So.2d 1378 (La.App. 2d Cir.1990), writs denied 567 So.2d 1123 and 1124, (La.1990). Such opinions are necessary sources of proof whose views are persuasive, though not controlling, and any weight assigned to their testimony by the jury is dependent upon the expert's qualifications, experience, and studies upon which his testimony is based. Alello v. Smith, 94-103 (La.App. 5th Cir. 7/26/94), 641 So.2d 664, writ denied 94-2231 (La.11/18/94), 646 So.2d 382. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
It is well settled that the testimony of each witness qualified and accepted as an expert should be given effect if and when it appears to be well grounded from the standpoint of sincerity and common sense. Quinones v. U.S. Fidelity and Guaranty Company, 93-1648 (La.1/14/94), 630 So.2d 1303. The weight to be given to the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based. However, the sincerity and honesty of opinions expressed are matters in which the trial court is in a particularly advantageous position to determine. It is, in effect, a question of credibility, and when the experts are widely disparate in their conclusions, the rule has special relevance. Quinones v. U.S. Fidelity and Guaranty Company, supra.
The finding of fact by a jury should be upheld unless it is shown to be clearly wrong or manifestly erroneous. Martinez v. Schumpert Medical Center, 27,000 (La. App.2d Cir.5/10/95), 655 So.2d 649. The Louisiana Supreme Court has announced a two-part test for the reversal of a fact finder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La. 1993), citing Mart v. Hill, 505 So.2d 1120 (La.1987).
Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the fact finder, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, supra; Stobart v. State, Department of Transportation and Development, supra.

Evidence Presented at Trial
The plaintiff contends that she presented ample evidence to establish the duty owed to her by the hospital, breach of that duty, causation and damages. The plaintiff, who was 67 years old at the time of the accident and 80 years old at the time of trial, testified that in the hospital she was instructed in using the walker but not in using the walker with the toilet seat extension, nor was she given instructions about using the seat at home when she was discharged from the hospital. On the morning of the accident, the plaintiff claims that she sat straight down and the toilet seat then tipped with her. She stated that she was 100% sure that she sat straight down on the seat.
Katherine Moore, the plaintiff's granddaughter, testified that she lived with the plaintiff during the time in which this accident occurred. She stated that her grandmother was not given any instructions regarding the use of the toilet seat extension when she was discharged from the hospital in December 1984. Her grandmother went to her son's house (the witness' father) after her discharge from the hospital, and remained there approximately one week. The plaintiff used the toilet seat extension at that residence without mishap. When the plaintiff returned to her own home, Katharine stated that she installed the toilet seat extension at the house and stated that it was not unsteady or loose and was not removed from the toilet for any purpose after its installation. Katherine testified that she used the *430 device, as did guests to the home and no problems were encountered. Katherine testified that on the day of the accident, she left the house to go to her job which began at 8:00 a.m. Shortly thereafter, she received a call that her grandmother had fallen. According to Katherine, when she looked in the bathroom, the toilet seat extension was tilted.
At trial the plaintiff's treating physician, Dr. Lewis Jones, testified that he ordered a toilet seat extension for the plaintiff to take home. He stated that he thought the plaintiff requested the toilet seat. The seat provided was identical to the one used by the plaintiff in her hospital room during her twelve-day hospital stay. However, Dr. Jones stated that he did not specify this particular type of seat for the plaintiff. Dr. Jones testified that regardless of the warning on the seat, in his practice he has found that patients can safely use this device with the assistance of a walker and that the seat was adequate and proper for the plaintiff's use two months following hip surgery. He testified that he has never had any other patient who reported any difficulty with the use of this toilet seat.
Brenda Ross, a registered nurse on the orthopedic floor at Willis-Knighton Medical Center, stated that she was employed at the hospital during the plaintiff's original hospitalization in 1984. She testified that she did not recall if she ever assisted the plaintiff in using the restroom. She stated that when she did aid patients, she instructed them to use the walker as their sole support in getting up and down. Ms. Ross signed the plaintiff's discharge papers when she checked out of the hospital in December 1994. She was questioned about a page in the plaintiff's hospital chart which was to be checked "yes" or "no" as to whether discharge instructions were given. In the plaintiff's chart, this item was left blank. She testified that she could not remember what instructions were given to the plaintiff on discharge. She stated that the usual procedure was to instruct a patient during his or her hospital stay how to use a walker and toilet seat extension and that on discharge, a patient would be shown how to install the toilet seat, reinforced on how to use it with a walker, and how to ambulate with a walker. The patient would also be instructed as to the amount of weight to put on the limb and proper wound care. She testified that she had seen toilet seat tipping problems, but this was due to improper patient usage and the patient was asked to sit down and then stand up straight.
Maude McCart, a licensed practical nurse employed at Willis-Knighton testified that she was part of the staff on the orthopedic floor that cared for Ms. Moore during her hospitalization. Ms. McCart did not recall ever assisting the plaintiff in using the bathroom. She stated that when she did assist patients they were instructed to use their walkers as their sole support in getting up and down. She testified that at that time, the practice was to chart only those things out of the ordinary, therefore, the chart did not contain a notation every time the plaintiff was assisted in using the bathroom in the hospital. It was also established that many times, nurses' aids assist patients in getting to the bathroom and aids were not allowed to make chart notations. Ms. McCart testified that this type of toilet seat extension was the only one in use at the hospital during the plaintiff's hospitalization. She also testified that the protocol on the orthopedic floor was to instruct patients in how to use walkers and in how to sit on the toilet with their walkers and this instruction was reinforced each time the patient went to the bathroom.
Ms. McCart testified that if a patient didn't sit on the toilet seat straight, it could tip forward. She stated that she had seen this happen, but the patient was not harmed and was told to sit down on the seat and try again to stand up straight. She stated that the physician determined the type of device to be used by patients and if a patient slowly and carefully uses this type toilet seat, there should be no problem in its use.
Illa Rogers, an expert in nursing, testified that she was employed at Willis-Knighton as the director of nursing in 1984-85 when the plaintiff was a patient there. She stated that the nursing staff and physical therapists would be involved in training patients to use walkers and bathroom facilities. She stated that the toilet seat extensions were utilized because they provided both comfort and safety *431 for post-operative orthopedic patients. She was questioned regarding the deficiencies in the plaintiff's hospital chart as to whether instructions in the use of the seat, while in the hospital or on discharge, were given. She stated that the patient would have been given verbal instructions at discharge but could not recall if, in 1985, written instructions were also issued. Ms. Rogers testified that the deficiencies in the chart represented a deviation in the charting policy of the hospital and not a deviation in the standard of care given the patient.
Paula Click Fenter, an expert in physical and rehabilitative therapy, testified that she was employed at Willis-Knighton in December 1984 and at that time patients were instructed in the use of their walkers and in making transfers. Ms. Fenter testified that the proper method for sitting down using a walker is to keep one hand on the walker and to reach back to the seat with the other hand.
Dr. Lee Etheridge, an orthopedic surgeon and a member of the medical review panel which found that neither Willis-Knighton nor Dr. Jones breached any standard of care in this case, testified that elevated toilet seats began to be used in the early 1980s and the type used in this case was the only kind he had seen. He testified that the plaintiff should have had some assistance while using this device and that, according to the standard of care today, this seat would be inappropriate. However, it was not inappropriate at the time this accident occurred, because they had just become available and "there was a learning curve going on." He stated that he had never heard of any other problems in using a toilet seat extension. Dr. Etheridge testified that after 70 days, the plaintiff would have recovered somewhat from her surgery and should be responsible for her own safety to some degree. He also stated that he felt that the plaintiff bears some responsibility for her fall.
To establish her claim that Willis-Knighton breached the applicable standard of care in giving her this toilet seat, the plaintiff introduced the testimony of numerous experts. These experts testified that the toilet seat was unstable and was not suitable for use by the plaintiff due to her balance problems caused by the use of a walker. They also testified that the plaintiff was not given correct instruction in the hospital as to how to make transfers from the toilet seat to the walker. They further testified that Willis-Knighton breached the applicable standard of care in failing to give the plaintiff instructions on discharge as to how to use the toilet seat extension.
The plaintiff presented the testimony of Dr. George Shoedinger, III, an expert in orthopedic surgery, who testified that the applicable standard of care in 1984 required the hospital to provide patients with appropriate medical devices consistent with their condition. He testified that it would constitute a deviation in the standard of care if a nurse fails to inform a patient that she must have assistance when using the seat extension and that it was inappropriate to provide this device to a patient without warning of its instability. His understanding of the accident was that the plaintiff did not sit straight down on the toilet seat and consequently, it tipped. The gist of this testimony was that the defendant breached its standard of care, not necessarily in providing this toilet seat, but in failing to properly instruct the plaintiff in how to use it and in not warning of its dangers. When questioned about the warning on the toilet seat, Dr. Shoedinger testified that he would agree that if there were any instructions or warnings on a medical device provided to a consumer for their use, the consumer is required to read the warning. He also stated that there was no doubt about the fact that someone should have been able to look at this device and determine that it is not stable because it could be easily removed from the toilet bowl.
Jeannine Onge, a registered nurse presented by the plaintiff as an expert in nursing care and hospital procedures, testified that this type of nonclamping toilet seat was not appropriate for use by a patient such as the plaintiff who had a balance problem due to hip surgery. She stated that the plaintiff needed a clamp down model and grab bars. If nurses instructed the plaintiff to use the walker as her sole support in seating herself and rising from the toilet seat, that would be *432 incorrect. Ms. Onge stated that a breach of the standard of care occurred in this case because the plaintiff's hospital chart does not show that discharge instructions were given including no instructions in the use of the toilet seat. Ms. Onge testified that the device could be safely used by patients with a walker if they were properly instructed. She also stated that she was not always aware that the plaintiff had used this type toilet seat throughout her hospital stay and she also assumed that the accident occurred when the plaintiff did not sit straight down on the toilet seat.
Barry Bates, an expert in biomechanical engineering with expertise in human performance, testified that the toilet seat given to the plaintiff was basically a dangerous device for the circumstances under which it was used. He stated that the plaintiff had a balance problem due to her walker. He also testified that the plaintiff must not have seated herself straight on the toilet seat because asymmetrical forces caused the accident.
Joan Seifert, a registered nurse who had worked at P & S Hospital and Louisiana State University Medical Center, testified that in 1984, various types of toilet seat extensions were available, including a model that clamped down on the toilet bowl, as well as an extension with arms and a bedside commode. She stated that the nonclamping model in this case was not appropriate for use by a patient such as the plaintiff was using a walker. Ms. Seifert testified that, due to problems with the nonclamping model, P & S Hospital discontinued its use and began using the model that clamped down. Contradicting the instructions given by Ms. Ross and Ms. McCart, this witness stated that if a patient was instructed to use a walker as the sole support for getting up and down from the toilet seat, this would be incorrect and would be a deviation in the standard of care. She also testified that it was a breach in the standard of care to fail to document discharge instructions and in dispensing this toilet seat to the plaintiff.
Sharon Kelly, an expert in physical therapy, testified that the hospital was careless in providing the plaintiff with a nonclamping toilet seat, given her balance problems caused by using a walker. According to Ms. Kelly, in 1984, clamping seats were available as well as bedside commodes that could also be used in conjunction with a toilet.

Discussion
It is not disputed that the trial court correctly instructed the jury that "the standard of care that a hospital owes to a patient is a national standard of care and is not governed by the locality rule." The plaintiff contends that, in finding that the defendant did not breach the standard of care owned to her, it must have rejected the instructions regarding a national standard of care and must have evaluated the evidence under a standard of care prescribed solely by the defendant, Willis-Knighton. Therefore, the plaintiff urges that the jury erred, as a matter of law, in rejecting her claim against the defendant requiring that this court conduct a de novo review of the record. After an extensive review of the record in this case, we are not persuaded that the jury failed to follow the trial court's instructions. We find that the jury evaluated the facts and circumstances of this case and made a factual finding to reject the evidence and testimony offered by the plaintiff regarding whether the defendant breached the national standard of care. Accordingly, we find that the jury did not err as a matter of law.
The plaintiff presented extensive expert evidence in an effort to establish her claims that the toilet seat extension was inappropriate because of her disability, that she was improperly instructed in the use of the seat and that, upon discharge, she was given no instructions in its use. The plaintiff claims that these factors prove that the defendant breached the standard of care owed to her. However, the record contains evidence and testimony which contradicts the plaintiff's claims.
As stated above, a hospital is required to exercise the amount of care toward a patient that the particular patient's condition may require. The plaintiff's contention is that the toilet seat given to her in this case was not appropriate for her use because she had a balance problem. However, Dr. Etheridge testified that in 1984, this was the type of toilet seat was commonly used and that he *433 never heard of any other patient being injured while using this type seat. Dr. Jones, the physician who issued this seat to the plaintiff, stated that the seat was adequate for the plaintiff's use, that patients with the plaintiff's disability could safely use the device and that he had never heard of any other patient having a problem using the seat. In addition, Dr. Jones stated that he thought the plaintiff requested a raised toilet seat to take home with her from the hospital.
Further, the seat had a warning label on it that was as readily visible to the plaintiff as to hospital personnel. Dr. Shoedinger, the plaintiff's own expert testified that the toilet seat required a warning to the plaintiff of its dangers but also stated that, because there was a warning on the seat, the consumer would be required to read that warning. He further stated that any instability the seat might have should be readily apparent to any user who looked at it due to the fact that it was not permanently attached to the toilet.
Nurses Ross and McCart testified that the only problems they observed in using the toilet seat occurred when patients used it improperly by failing to sit down and stand up straight. However, the seat was safe if used slowly and carefully by the patient.
Barry Bates, the plaintiff's expert in biomechanical engineering, stated that this accident could not have occurred unless the plaintiff failed to sit down on the seat straight. The plaintiff testified that she was 100% certain that she sat straight down on the toilet seat.
Katherine Moore testified that she installed the toilet seat in the plaintiff's home and this it was not unsteady or loose. Further, it was used for approximately two months, not only by the plaintiff, but also by Katherine and by visitors to the home, without any difficulty.
Also, Dr. Etheridge, a member of the medical review panel, stated that seventy days following her surgery, the plaintiff should have been responsible for her own safety to some extent and bore some responsibility for her fall.
Even though the plaintiff presented testimony by numerous experts to support her claims, the record also shows that the plaintiff used the seat for twelve days in the hospital, asked to take one home, and then used the seat for seventy days in her own home without mishap. The warnings on the seat were as readily discoverable by the plaintiff as by personnel at the hospital. Further, the record contains testimony that, if used slowly and carefully, the toilet seat was safe for use even by persons on walkers. Therefore, there is a basis in the record for the jury to conclude that the toilet seat extension provided to the plaintiff was not inappropriate for her to use seventy days following her original surgery.
Regarding the claim that she received improper instructions in the use of the walker with the toilet seat, the record show that, although the nurses on the orthopedic floor who cared for the plaintiff during her 1984 hospitalization did not relate the proper method for making transfers, it is not clear that these nurses ever assisted the plaintiff in using the bathroom and gave her the improper instructions. Further, the record shows that the main responsibility for such instruction comes from the physical therapists. Paula Click Fenter testified as to the proper method for making transfers and stated that hospital patients were given such instruction. Therefore, there was a basis in the record for the jury to conclude that the hospital did not breach its standard of care to the plaintiff by improperly instructing her in using a walker to transfer from a walker to the toilet seat extension.
Finally, the plaintiff contends that the hospital breached its standard of care in failing to give her instructions upon discharge in how to use the toilet seat. The record shows that hospital personnel could not remember if written discharge instructions were given to patients in 1984 or whether only oral instructions were given. Brenda Ross, the plaintiff's discharge nurse, testified as to what instructions are usually given a patient upon discharge. Regarding the fact that the plaintiff's chart did not indicate whether discharge instructions were given, Illa Rogers, director of nursing, testified that this was a deviation in the charting procedure and not a deviation in the standard of cared owed to this patient. Therefore, there is a reasonable basis in the record for the jury to conclude that Willis-Knighton *434 did not breach the applicable standard of care in failing to give the plaintiff discharge instructions.
In this case, even though the plaintiff presented expert testimony which conflicted with the defendant's position, the issue of whether a breach in the standard of care occurred is a factual question over which the jury had great discretion and the resolution of which turns upon the evaluation of the credibility of the testimony by experts and others. Although there may be two permissible views of the evidence, the jury here made a choice and we do not find that their choice is manifestly erroneous or clearly wrong. Even though a reviewing court might feel that other evaluations and inference may be more reasonable than those of the jury, the jury in this case made reasonable evaluations of credibility and reasonable inferences of fact which will not disturb upon review.

CONCLUSION
For the reasons set forth above, the jury verdict and trial court judgment, finding that the defendant, Willis-Knighton Medical Center, did not breach the applicable standard of care owed to the plaintiff, Madeline Moore, is affirmed. Costs in this court and in the court below are assessed to the plaintiff.
AFFIRMED.