732 So.2d 683 (1999)
Rick and Venise ORTEGO, individually and on behalf of their minor child, John Richard Ortego, Jr., Plaintiff-Appellant,
v.
Debbie JURGELSKY, Defendant-Appellee.
No. 98-1622.
Court of Appeal of Louisiana, Third Circuit.
March 31, 1999.
*684 Maury A. Herman, New Orleans, Leslie J. Schiff, Opelousas, Joseph A. Knott, for Rick Ortego et al.
Marc W. Judice, Lafayette, for Debbie Jurgelsky et al.
BEFORE: DOUCET, C.J., SAUNDERS AND SULLIVAN, JJ.
SAUNDERS, Judge.
This appeal arises from a medical malpractice suit wherein the lower court found in favor of Dr. Debbie Jurgelsky, hereinafter "Defendant," and against Rick and *685 Venise Ortego, individually and on behalf of their minor child, John Richard Ortego, Jr., hereinafter "Plaintiffs." Plaintiffs alleged that Defendant acted negligently and breached the standard of care during the delivery of their child, John Richard Ortego, Jr., and, consequently, caused the injuries which lead to the baby's death nine days later. A medical review panel and the lower court found that Defendant acted within the standard of care. We affirm.

I. FACTS
On July 22, 1989, John Richard Ortego, Jr. was born at the Doctors' Hospital in Opelousas, Louisiana and died nine days later. His mother, Venise, had delivered two babies before this delivery. Defendant was not Venise's treating physician on either of these earlier occasions. Each prior delivery was initially attempted as vaginal births but failed for different reasons, with Caesarean sections being the ultimate result. For her third delivery, Plaintiff again wanted to attempt a vaginal delivery, and she insisted that she be allowed a trial of labor. After being evaluated by Defendant and reviewing the options with Plaintiff, Defendant allowed Venise to attempt a "vaginal delivery after Caesarean," (VBAC). The vaginal delivery attempt failed, and John Richard was delivered via Caesarean section.
Plaintiffs brought a medical malpractice claim against Defendant and the Commissioner of Insurance. On September 5, 1991, a medical review panel found that Defendant had not deviated from the standard of care since Defendant's decision to perform a Caesarean section was based on failure to progress, not fetal distress, and that there was no documented evidence of acute asphyxial injury, either in an autopsy or otherwise. Plaintiffs then brought a civil action against Defendant and the Doctors' Hospital. A settlement was reached with the hospital, and a jury found that Defendant did not breach the standard of care.

II. LAW AND ANALYSIS

A. Standard of Review

It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989), reh'g denied 561 So.2d 105 (La.5/11/90) citing Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). The role of an appellate court is not to review factual issues de novo. Id. Virgil v. American Guar. and Liab. Ins., Co., 507 So.2d 825, 826 (La.1987), explains:
Louisiana's three-tiered court system allocates the fact finding function to the trial courts. Because of that allocation of function (as well as the trial court's normal procedure of evaluating live witnesses), great deference is accorded to the trial court's factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court's judgment.
La.R.S. 9:2794(A) provides that in a malpractice action against a physician, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the *686 degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Hence, the inquiry is three-fold. In the matter sub judice, Plaintiff must establish the standard of care, that Defendant's treatment fell below the standard of care, and the causal connection between the alleged negligent treatment and the infant's death. "Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error." Ferrell v. Minden Family Care Center, 30,088, p. 3 (La.App. 2 Cir. 12/19/97); 704 So.2d 969, 972, writ denied, 98-0392 (La.3/27/98); 716 So.2d 891, citing Iseah v. E.A. Conway Mem'l Hosp., 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992); Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272 (La.1991).

B. Patient History

Plaintiff first assigns as error the jury's failure to find for Plaintiff where Defendant did not obtain records and/or inquire of other doctors about Plaintiff's obstetrical history regarding her two previous Caesarean sections. Plaintiff asserts that the standard of care requires acquisition of a patients medical history, to the greatest extent possible, and that Defendant's failure to acquire the medical records from Plaintiff's previous doctors breached this standard of care. Defendant answers this argument with the assertion that she received detailed information about the prior births from Plaintiff, who was very articulate and knowledgeable. Additionally, Defendant asserts that all historical medical information that she received from Plaintiff was both accurate and adequate. Plaintiff argues that she was unaware of and should have been informed of the likelihood of C.D., Cephalopelvic Disproportion, which was the cause of her other Caesarean deliveries. Testimony at trial indicated that C.D. is a term describing more than one set of circumstances which might arise during an attempted vaginal delivery. It was also explained that the condition is non-recurrent and is unique to each mother and baby. The record indicates that C.D. literally describes a disproportion in the size of the mother's pelvis as related to the size of the infant's head, thereby making vaginal delivery impossible. Additionally, testimony was given explaining that the term C.D. is also generally applied to describe situations such as the ones Plaintiff had detailed to Defendant, to wit: Plaintiff's first C-section was made necessary because her eight -pound, eleven ounce baby was too large and failed to descend after five hours of labor; Plaintiff's second baby was delivered by C-section when the position it was in, the occiput transverse position, made vaginal delivery extremely difficult, if not impossible. Testimony evidenced that Plaintiff had not previously suffered from a C.D. to the extent that a specific finding was made that her pelvis was too small for her infants' heads; rather, in the first delivery, there is nothing in the record indicating measurements taken of either Plaintiff's pelvis or the head of her first baby. Dr. Gonsoulin testified that when he delivered Plaintiff's second baby, he sectioned her because it did not descend. Dr. Gonsoulin admitted that he had not taken an ultrasound measurement or any other measurement of the infant's head.
The evidence and testimony does not indicate that Plaintiff incorrectly understood *687 the reasons for these earlier decisions for C-section delivery or that there were complications from her prior vaginal birth attempts that concerned a measured head/pelvis disproportion. Furthermore, Defendant testified at trial that after she reviewed Plaintiff's prior medical records, she found they only supported Plaintiffs rendition of her obstetrical history and that there was nothing in the records that would have changed her decision to attempt a VBAC.
The record reveals no manifest error in a jury finding in favor of Defendant where, even if she acted negligently when she chose not to ascertain the actual records from Plaintiff's former physicians, nothing indicates that Defendant was unaware or misinformed of Venise's obstetrical history. There has been no showing that Plaintiff was kept in the dark regarding the nature of her prior complications so as to jeopardize her ability to make informed decisions concerning her third attempt at a vaginal delivery. Accordingly, where a jury reasonably found, at the very least, no compromising or prejudicial relationship, i.e. no causal relationship, between the Defendant's failure to acquire the official medical records of the earlier deliveries and Plaintiff's ability to make an informed decision, we must affirm the jury's factual finding.

C. Duty to Inform

Plaintiff asserts that the jury manifestly erred when it failed to find for Plaintiff in light of Defendant's failure to inform Plaintiff both that her infant's head was too large to pass through her pelvis without risk and that C.D. was the cause of her earlier C-sections, thereby preventing Plaintiffs complete understanding of the risks of an attempt at vaginal delivery. The record shows that Defendant did measure the infant's biparietal diameter and estimated the baby's weight, finding the numbers within the range acceptable for an attempt at VBAC. The expert testimony was inconsistent on the issue of whether the estimated measurements Defendant made were sufficient and on whether there is any reliable way to determine if C.D. exists prior to actually attempting vaginal delivery. As explained in the record and above, the earlier Caesarean sections arose from infants that did not descend; the precise head to pelvis ratio measurement was not provided or indicated in the first Caesarean performed, and Dr. Gonsoulin took no such measurements. Dr. Gonsoulin did note, however, that he inspected Plaintiffs pelvis and found it adequate for delivery. There is sufficient evidence in the record upon which a fact finder might reasonably determine that Defendant did not breach her duty of care in not discussing the baby's head size further, where the ultrasound indicated that the infant's head was under the ten centimeters limit and that at birth, it was still, in fact, smaller than ten centimeters.
Plaintiff next argues that when Defendant did not obtain the actual records of Plaintiff's prior births, she breached the standard of care when she failed to warn Plaintiff about the likelihood of a complication termed "C.D." Yet the coherence between Plaintiffs description of the difficulties leading up to the first two C-sections with the medical records indicates that Plaintiff had a clear grasp of what had occurred during her previous vaginal delivery attempts. Defendant testified that Plaintiff was very articulate, precise and thorough in her explanation and that the information she obtained from Plaintiff was accurate. There is no indication that if Defendant would have used the phrase "C.D." to describe Plaintiff's earlier deliveries that that would have added anything more to Plaintiff's understanding about them. The testimony indicated that the accurate description Plaintiff gave of her earlier deliveries is consonant with what the expert testimony deemed C.D. situations. It is readily understandable how fact finders might disagree as the what additional meaning the label "C.D." would have provided Plaintiff.
*688 Regarding the risks involved in either a vaginal or Caesarean delivery, Defendant testified she made herself available for and met with the Plaintiffs to discuss the pros and cons of attempting a vaginal delivery, including the benefits to the infant's lungs and the benefits to the mother and the risk of having to undergo a C-section at the last minute anyway. What the Plaintiff understood and her credibility are very much factual issues, and we find ample evidence on the face of the record upon which reasonable jurors could differ. In sum, we find no manifest error in the jury's finding that Defendant did not breach her duty to inform Plaintiff regarding the baby's head size or her duty to inform of a repeat C.D. when Plaintiff exhibited a detailed understanding of her history.

D. The Standard of Care

Plaintiff asserts it was manifest error for the jury to find for Defendant when she delayed the Caesarean section and took longer than thirty minutes from "decision to incision" when she actually did perform the section. The record indicates, again, conflicting expert testimony which presented a credibility decision for the jurors to make. Plaintiff's experts opined that Defendant waited too long before determining that a section would have to be performed while Defendant's experts explained that the fetal monitor tracings indicated no fetal distress occurred prior to the decision to perform a C-section. When questioned, Defendant explained that she declined when asked at 3:10 p.m. if she wanted an on call scrub tech in the house because "they have to be within thirty minutes and I wasn't sure she [Plaintiff] was within thirty minutes." She explained that she did not give an order to notify a scrub tech at that time because the hospital is supposed to have one available within thirty minutes. Further, Defendant explained that it was 5:30 p.m. when she first requested that the scrub tech be notified and that at 5:45 p.m., she decided that a section would be necessary. Defendant testified that at 5:45 p.m. it was not at that time an emergency situation. The chart by Nurse Donna Watson Vidrine verified that Defendant notified the scrub tech at 5:30 p.m. and at 5:45 p.m. the notes indicate a "C-section called for by Dr. Jurgelsky." The record indicates that it was well after thirty minutes before the scrub tech responded. At 6:25 p.m., Defendant explained that the infant's heart tones had dropped and were not rebounding as quickly as they had before. It was then that she felt they were in an emergency situation and she rushed Plaintiff to the operating room. Defendant started the section at 6:37 p.m. and completed it by 6:38 p.m.
Regarding the standard of care and causation, the abundance of conflicting expert testimony presented much for the fact finder to weigh and consider. A few of these conflicts included, to wit: Doctors Kerkhoff, Kempf and Boehm found Defendant thoroughly acted within the standard of care in attempting the VBAC, while Doctors Gonsoulin, Abern and Lilling felt it was a poor decision; Doctors Kerkhoff and Kempf disagreed with Dr. Akkaraju, who diagnosed the infant with an hypoxic injury, with Dr. Adams, who had diagnosed the baby with perinatal asphyxia and with Dr. Belizaire, who determined the infant had a history of neonatal asphyxia. Doctors Kerkhoff and Kempf felt that the autopsy report did not show tissue damage consistent with an hypoxic injury. The expert testimony also varied on deciding what the contraindications for a VBAC might be, and the testimony varied as to what the fetal heart monitor strip indicated. In sum, the jury weighed the credibility of the witnesses, balanced the conflicting testimony and made its conclusions as fact finder. A review of the record reveals ample testimony upon which a fact finder could have found that Defendant acted within the standard of care and/or the Defendant's actions were not a causal factor in John Richard's death. In the absence of manifest error, we affirm the jury's conclusions.

*689 E. The Medical Review Panel

Plaintiff asserts that two members of the Medical Review Panel, Doctors Kerkhoff and Kempf, violated La.R.S. 40:1299.47(C)(5), which requires a panelist to take the following oath:
I will faithfully perform the duties of medical review panel member to the best of my ability and without partiality or favoritism of any kind. I acknowledge that I represent neither side and that it is my lawful duty to serve with complete impartiality and to render a decision in accordance with law and evidence.
This final assignment of error claims that Dr. Kerkhoff failed to disclose that he delivered Plaintiff's first born child and that his extended working relationship with Defendant rose to the level of a conflict in interest. Plaintiff also claims that Dr. Kempf was not impartial because he also had a close working relationship with Defendant. We note that the "sole duty of the panel is to express its expert opinion(s) ..., and the findings of the medical review panel is not binding on the litigants." Derouen v.Kolb, 397 So.2d 791, 794 (La.1981). Hence, the weight of the findings of the medical review panel is subject to credibility decisions which are to be made by the fact finder. Whitt v. McBride, 94-896 (La.App. 3 Cir. 3/1/95); 651 So.2d 427.
The section of the Medical Malpractice statute dealing with conflicts of interest is La.R.S. 40:1299.47(C)(7) which provides, in pertinent part:
A panelist or the attorney shall disclose in writing to the parties prior to the hearing any employment relationship or financial relationship with the claimant, the health care provider against whom a claim is asserted, or any other relationship that might give rise to a conflict of interest for the panelists.
As a dispositive issue, we consider whether Plaintiff has made a timely challenge to the medical review panelists. In Whitt, 651 So.2d 427, when the claimant learned that the panelist selected by the defendant presented a potential conflict of interest, she brought her challenge to the trial court in a "Motion to Remove Physician from Medical Review Panel." In Whitt, we explained that "La.R.S. 40:1299.47(C)(7) only mandates that these relationships [of potential conflict] be disclosed in writing to the parties. It does not specify automatic disqualification from service on the panel. Rather this determination is left to the discretion of the trial court." Id. at 429. When the claimant in Whitt lost her motion in the trial court, she then appealed. In Medical Review Panel for the Claim of White v. The Board of Administrators of the Tulane Educational Fund, 94-CA-2535 (La.App. 4 Cir. 5/16/95); 655 So.2d 803, writ denied, 95-1505 (La.9/22/95); 660 So.2d 484, the claimant challenged a panelist using a Motion for a Declaratory Judgment which sought to order the chairman of a medical review panel to require the claimant to select a particular type of physician. In the present matter, we find that where Plaintiff raises a challenge to the composition of the medical review panel long after it has reached a conclusion and after a full trial on the merits, it is untimely; we are not a court of first instance. The proper method to challenge a medical review panelist would have been by motion to the trial court.

III. CONCLUSION
In light of the foregoing, we find no manifest error in the jury finding that Defendant's conduct did not breach the standard of care or negligently bring about the death of John Richard Ortego, Jr. Likewise, we find no manifest error in the conclusion that Plaintiff was adequately informed of her obstetrical history so as to make a knowledgeable decision. Further, we affirm the jury's rule in favor of Defendant as the record indicates that the jury's factual determinations were concluded *690 from a weighing of evidence upon which fact finders could reasonably disagree.

DECREE
We affirm the jury's verdict in favor of the Defendant, Debbie Jurgelsky, and assign costs of appeal to Plaintiffs.
AFFIRMED.