I, MURRAY, Judge.
Tanika Williams and Byron Nedd, parents of the deceased child, Terrell Williams, appeal the judgment of the trial court in favor of defendants, Children’s Hospital, Dr. Carl Robinson, and St. Paul Fire and Marine Insurance Company. We affirm.
FACTS:
Terrell Williams, a sixteen month old boy, was seen in the emergency room of Children’s Hospital on February 5, 1995. His mother complained that Terrell had fever off and on, diarrhea, vomiting, nasal congestion and was not eating. She related that she was giving Terrell Motrin for fever and was using Atarax for a previously diagnosed skin condition. The first triage nurse noted that Terrell’s breathing was effortless, his lungs were clear, and he did not have a cough. He had a temperature of 104.3 degrees, his pulse was 186, his respiration was 38, his blood pressure was 117/62, and his weight was 22 lbs. 8 oz. It was noted that Terrell was crying. A second triage nurse completed an assessment of Terrell, and noted that he was awake and alert. His breathing was deep *402 and effortless, his lungs were ladear, and he had a non-productive cough. His appearance was pink, he had bowel sounds, his abdomen was soft and non-distended, his mucous membranes were moist and pink, and his skin was warm, dry and clear. The examining doctor also noted a history of fever off and on, with cold and congestion. Terrell had vomited three times that day and had five episodes of diarrhea. The mother related that Terrell had sickle cell trait and had no known drug allergies. Impacted wax was removed from the child’s left ear, after which the doctor noted redness, and diagnosed Terrell as having otitis media of the left ear. The doctor noted that Terrell looked well hydrated. However, because of the complaints of diarrhea and vomiting, and the moderately high temperature, the doctor ordered a blood work-up, urinalysis and blood and urine cultures. Nursing notes indicate that Terrell was drinking orange juice while waiting for the lab reports. The blood work indicated that Terrell had a low white blood cell count. Terrell was discharged with a diagnosis of otitis media of the left ear. Ceclor, an antibiotic, was prescribed. The discharge sheet indicates that Ms. Williams was instructed to give Terrell Motrin for pain and fever, to return to the emergency room if there were problems, and to make an appointment with Dr. Bordenave, Terrell’s private pediatrician, in the morning. Because blood and urine cultures take at least twenty-four hours to develop, the results of those tests were not available before Terrell was discharged.
Two days later on February 7, at approximately 6:30 p.m., Ms. Williams returned with Terrell to the emergency room at Children’s Hospital. The first triage nurse noted Ms. Williams’ complaints as a cold with congestion for about a |3month, vomiting, and sores in Terrell’s mouth. Ms. Williams told the nurse that Terrell was taking Ceclor, Atarax and Motrin. The nurse noted that Terrell’s respiration was effortless, but that he did have a stuffy nose. Upon physical examination, the nurse noted, that his breath sounds were slightly coarse. The notes indicate that a cough was present, but there was no indication of whether or not it was productive. Terrell’s temperature was 100.5 degrees, his pulse was 160, his respiration 32, his blood pressure 102/68, and his weight was 21 lbs. 2 oz. The second triage nurse’s notes indicate that Terrell was awake and alert when examined, and that he was crying tears. His respiration was labored, and again the physical éxamination revealed coarse breath sounds. It was noted that Terrell had wet only two diapers that day. He had a sore on his right ear, and ulcers in his mouth.
The history recorded by the doctor indicated that he was told about Terrell’s visit to the emergency room on February 5, and the diagnosis of otitis media. The mother told him that Terrell was on Ceclor and Motrin, but he was still congested and now had sores in his mouth. He had vomited three times that day, but had no diarrhea. She stated that he had a low grade fever. It was noted that Terrell was alert, active and well hydrated. He was diagnosed with herpetic stomatitis. Ms. Williams was instructed on discharge to discontinue the Ceclor, to swab Terrell’s mouth with a mixture of Maalox and Benadryl, and to give him Pediaprofen for congestion, and Tylenol every six hours as' needed for fever. She was told to return to the emergency room if his fever increased, if he had no wet diapers for a day, or |4if he produced no tears when crying. She was told to make an appointment with Dr. Borde-nave.
At about 7:45 p.m. on February 8, Ms. Williams returned with Terrell to the Children’s Hospital emergency room complaining that he was dehydrated. She explained that he did not produce tears when he cried, and that he had not eaten or drunk since the evening before. She told the triage nurse that she was administering the Maalox/Benadryl solution, and giving him Motrin. The nurse indicated that *403 Terrell’s respiration was effortless, and that Ms lungs were clear. He had no cough. His vital signs were a temperature of 99.4 degrees, pulse 160, respiration 36, blood pressure 134/89, and weight 19 lbs. 13 oz. The second assessment of Terrell indicated that he was sleeping, his breathing was effortless, his lungs were clear, and he had no cough. His other vitals were within normal limits. It was noted that he had lesions on his tongue.
The doctor’s notes reflect that Ms. Williams gave a history of having brought Terrell to the emergency room the previous day, that he had been diagnosed as having herpes gingivostomatitis, that he had refused all oral intake, and had not urinated that day. The notes do not indicate, however, that Ms. Williams mentioned the visit to the emergency room on February 5. The doctor noted that Terrell was not clinically dehydrated, and was drinking 10K freely and without difficulty in the emergency room. He ordered blood work and a urinalysis. Although the results of the urinalysis were within normal ranges, the blood work indicated that Terrell’s white blood cell count was down. Terrell was discharged |swith a diagnosis of anemia, and stomatitis, and Ms. Williams was instructed to continue the Motrin, Maalox/Benadryl swab, and to see Dr. Bordenave for follow-up.
Two days later, on the morning of February 10, Ms. Williams decided to take Terrell to Charity Hospital because she did not think Children’s Hospital was doing anything for him. In route to the bus stop, Ms. Williams noticed that Terrell was not breathing. She ran into a senior citizen center and called her mother. The personnel at the center called 911, and began CPR on Terrell. Terrell and his mother were picked up and rushed to Jo Ellen Smith Hospital by her grandmother, Mabel Jones. The Jo Ellen Smith records indicate that Terrell was not breathing and had no pulse when he arrived at the hospital. His nail beds were blue, his membranes cyanotic, his neck, legs and jaw were rigid, and the rest of his body was somewhat rigid. Emergency measures to resuscitate Terrell failed, and he was pronounced dead approximately one half hour after arriving at the emergency room. The death certificate listed the cause of death as sepsis; bilateral adrenal hemorrhage.
Terrell’s parents brought this action against Children’s Hospital, Dr. Carl Robinson, and their insurer, St. Paul Fire & Marine Insurance Company. A jury trial resulted in a unanimous verdict in favor of the defendants, and the court entered judgment in accordance with the verdict. Plaintiffs’ motion for judgment notwith-. standing the verdict and/or for new trial was denied by the trial court, and this appeal followed.
RLAW AND ANALYSIS:
In response to interrogatory number one, the jury answered that the care provided to Terrell Williams by Dr. Carl Robinson and Children’s Hospital did not fall below the standard required of them. Plaintiffs urge this court to reverse that finding because they presented sufficient evidence to establish that these defendants deviated from the appropriate standard of care in their treatment of Terrell, and that their substandard treatment caused Terrell’s death.
In order to reverse the jury’s verdict, an appellate court must find that there is no reasonable factual basis for that verdict in the record, and that the record establishes that the verdict is manifestly wrong. Stobart v. State, Through Dep’t of Transportation and Development, 617 So.2d 880 (La.1993); Pollerin, supra at p. 5, 696 So.2d at 592. The reviewing court must give great deference to a jury’s findings when medical experts express different views, judgments and opinions about whether the standard of care was met in any given case. Moore v. Willis-Knighton Medical Center, 31203, p. 4 (La. App. 2 Cir. 10/28/98), 720 So.2d 425, 428-29.
*404 Each side in this litigation offered expert testimony in support of its position on whether Dr. Robinson and Children’s Hospital deviated from the appropriate standard of-care in treating Terrell. A summary of that expert testimony follows.
I. THE PLAINTIFFS’ EXPERT TESTIMONY:
A. The report of the Medical Review Panel
Plaintiffs introduced the opinion of the medical review panel. It was the panel’s unanimous opinion that both Children’s Hospital and Dr. Robinson 17deviated from the appropriate standard of care in their treatment of Terrell Williams.[1] La.Rev. Stat. 40:1299.47 H; Ortego v. Jurgelsky, 98-1622, pp. 9-10 (La.App. 3 Cir. 3/31/99), 732 So.2d 683, 689 (The weight of the findings of the medical review panel is subject to credibility decisions which are to be made by the factfinder.)
B. Dr. John Boulet
Dr. Boulet is a board certified pediatrician and pediatric emergency care physician who was a member of the medical review panel. He testified that the most overwhelming factor in his finding of negligence on the part of Children’s Hospital and Dr. Robinson was that Terrell lost a substantial amount of weight over the course of several visits to the emergency room. It was his opinion that the weight loss was a- critical sign of dehydration, and that Terrell should have been hospitalized for observation. Additionally, because of the low white blood cell count, Dr. Boulet testified that he would have done a blood culture, and admitted Terrell for intravenous antibiotic treatment.
On cross-examination, Dr. Boulet acknowledged that a physician treating a patient for the first time must rely on the accuracy of records kept by previous physicians and nurses, and on the history given by the patient or parent.
|RC. Dr. Kris Sperry
Dr. Sperry, a board certified pathologist testified by deposition. He had examined the protocol and tissue slides from Terrell’s autopsy, and testified that his examination revealed the presence of severe, acute pneumonia superimposed upon bron-chiolitis. It was his opinion that Terrell initially had a viral infection, but that a bacterial infection subsequently developed, and that he probably developed pneumonia within forty-eight hours of his death. He opined that Dr. Robinson mistakenly presumed that the herpetic stomatitis accounted for all of Terrell’s symptoms, and because that condition is viral, he did not prescribe antibiotics. However, a chest x-ray would have revealed the developing pneumonia. In Dr. Sperry’s opinion, the fact that Dr. Robinson did not have the benefit of a thorough history, either written or from personal knowledge, created an even greater reason to hospitalize Terrell for continuity of care. Finally, Dr. Sperry did not believe that Ms. Williams’ continued reliance on emergency room care contributed to Terrell’s death.
D. Dr. William Newman
Dr. Newman, a pathologist employed by the Orleans Parish Coroner’s Office, performed the autopsy of Terrell. He acknowledged that he was not qualified to give an opinion as to the standard of care applicable to the emergency room treatment Terrell received. Called by plaintiffs to establish the cause of Terrell’s death, Dr. Newman testified that he believed that the child died from pneumonia.
IflII. THE DEFENDANTS’ EXPERT TESTIMONY:
A. Dr. John Gavin
Dr. Gavin is the medical review panel member who denied having signed the opinion finding negligence on the part of *405 Children’s Hospital and Dr. Robinson. Dr. Gavin is board certified in both pediatrics and emergency medicine, and teaches emergency medicine at the Earl K. Long Charity Hospital in Baton Rouge. Although he primarily teaches emergency medicine, because he is also a pediatrician, he handles a large volume of pediatric emergency cases.
Dr. Gavin testified that he reached the following conclusions after reviewing the Children’s Hospital records: On February 5, Terrell presented with a temperature of 104.3, which was not life threatening nor necessarily indicative of a terminal infection. By February 7, his temperature had dropped to 100.5, and by February 8, to 99.4. The drop in temperature would indicate to him that the problem, a viral infection, was resolving. Dr. Gavin reviewed the autopsy protocol and concluded that no one really knew conclusively what killed Terrell, although he agreed that it appeared to be sepsis. He stated that the sepsis could have been arrested if Terrell had been hospitalized and placed on antibiotics at least two days prior to death. However, the blood cultures conducted at Children’s Hospital indicated no bacterial growth. Therefore, the doctors at Children’s would have had no reason to suspect that Terrell had a bacterial infection. |inB. Dr. Druby Hebert
Dr. Hebert, a board eligible pediatrician and the director of the Children’s Hospital emergency room, was qualified as an expert in pediatrics, pediatric emergency medicine and emergency room operation. He explained that if a child is brought in to an emergency room for non-emergent care, it is common practice for the child to be treated and then referred to the private physician for follow-up care. If a child is admitted to the hospital, the hospital would contact the private physician for input, and for the private physician to note the hospitalization on the patient’s office chart. Dr. Hebert explained that it is problematic when people use an emergency room as a primary care facility, because, for example, Children’s Hospital has thirteen different doctors working in the emergency room, narrowing the odds of seeing the same doctor again. Better care is received from private doctors because the doctor becomes familiar with the patient’s history, and can recognize more easily subtle changes.
Dr. Hebert interpreted the Children’s Hospital records for the jury, based on his expertise in emergency room care. He noted that Terrell’s breathing and heart rate were slightly elevated on February 5, but explained that this was probably due to the fever of 104.3 degrees. Because of the fever, diarrhea and vomiting, the doctor ordered lab work to check Terrell’s electrolyte level for signs of dehydration. Blood and urine cultures were ordered to check for bacteria, although the low white blood cell count was probably indicative of a viral infection. He testified that he would not have ordered a chest x-ray because the physical lnexamination did not give any indication of pneumonia. Although he noted that an ear infection is usually viral in nature, he too would have erred on the side of caution and prescribed an antibiotic. As was done in this case, he would have told Ms. Williams to return to the emergency room if Terrell’s condition worsened overnight, but otherwise to see her private physician in the morning.
The chart from February 7 indicated that Ms. Williams returned at about 6:30 p.m. She told the triage nurse that Terrell had fever, congestion, vomiting, and mouth sores. Ms. Williams said Terrell was being given Ceclor, Motrin and a medicine for congestion. Dr. Hebert explained that Terrell’s temperature of 100.5 degrees was a very slight fever; a temperature of 100 degrees or less is not considered a fever. The notes indicated that the child was crying tears, and that his respiration was labored, probably due to his crying.
Dr. Hebert explained that the doctor on February 7 would have no way of knowing that Terrell had been seen in the emergency room on February 5, unless the mother *406 told him. Assuming that Ms. Williams did tell Dr. Robinson about the February 5 visit, Dr. Robinson would have access to those records because they would remain in the emergency room until the lab work was completed. Dr. Hebert explained that he did not know if Dr. Robinson looked at the records from February 5, but if he had he would have seen that the blood and urine cultures both indicated the absence of bacterial growth after two days, and that Terrell had lost 1.6 lbs. in 48 hours. The absence of bacteria was proof that Terrell’s problems were viral in nature, and the loss of weight was probably due to his not eating |12because of the painful sores in his mouth. However, because Terrell did not want to eat or drink because of the sores, and had lost 6 percent of his body weight, it was important that he be watched closely for dehydration.
Dr. Hebert testified that Dr. Robinson correctly instructed Ms. Williams to see her pediatrician in the morning or return to the emergency room if Terrell’s fever went higher, if he produced no tears when crying, or did not urinate for a day.
In Dr. Hebert’s opinion, Dr. Robinson did not deviate from the reasonable standard of medical care for an emergency room physician in this case. The instructions on discharge were to continue the Maalox/Benadryl swab for the mouth sores, to give Tylenol for fever, and Pedia-profen for congestion. It was reasonable to discontinue use of the Ceclor because all of Terrell’s symptoms were viral, and the cultures indicated a lack of bacteria. Dr. Robinson’s biggest concern should have been dehydration, and the records indicate that Ms. Williams received instructions about the signs ■ of dehydration, and was told to return to the emergency room if the signs became evident.
The records of February 8 indicated that Ms. Williams returned to the emergency room complaining that Terrell was exhibiting signs of dehydration. She explained that he had not eaten or drank anything since the evening before. Dr. Hebert noted that at this point Terrell had lost 12 percent of his body weight. However, the emergency room doctor could only know this if he was privy to the records from the previous two visits. The triage notes indicate that Ms. Williams told of the visit on February 7, but not February 5. Dr. Hebert testified, that | ^assuming the doctor on February 8 looked at the February 7 records, he would have noted only a 6 percent weight loss from the 7th to the 8th. Because of the history given of no tears and no oral intake, the doctor correctly suspected the beginnings of dehydration, and ordered blood tests. Without knowledge of the February 5 visit, the emergency room doctor could not know that Terrell’s weight had actually dropped 12 percent in 72 hours. The doctor on physical examination did not note any respiratory distress, so there was no reason to suspect pneumonia. Terrell remained in the emergency for about four hours, waiting for the results of the blood tests, and drank fluids during that time. The blood work indicated low white and red blood cell counts, which Dr. Hebert explained was normal in the case of viral infections, and the urinalysis did not indicate dehydration.
Dr. Hebert explained that he had the benefit of reviewing all of Terrell’s records, as did all of the experts involved in this case. Therefore, from that perspective it was easy to see that the child had a 12 percent weight loss in 72 hours, and likely needed to be admitted for administration of intravenous fluids. However, emergency room doctors who see a patient on a one-time basis must rely on the history given by the patient, a fact that underscores the importance of continuity of care with one physician. It was Dr. Hebert’s opinion that the doctor on February 8 did not deviate from the appropriate standard of care. There were no physical signs of pneumonia, but there was a concern about dehydration, which the doctor addressed appropriately.
*407 l14Under cross-examination, Dr. Hebert disputed the medical review panel’s finding that it was a breach of the standard of care to not review records of a patient who presents twice to an emergency room in a 24-hour period. He pointed out that only two of the three doctors on the medical review panel were qualified in emergency medicine, and that those two doctors disagreed on whether the standard of care was breached.
C. Dr. Joseph Awotwi
Dr. Awotwi, the emergency room physician who treated Terrell on February 8, testified that he is board certified in pedia-tries, with a focus on pediatric pulmonary care. He had extensive emergency room experience.
Dr. Awotwi testified that Ms. Williams told him Terrell had been in the emergency room the day before and was diagnosed with stomatitis. His physical examination revealed no signs of pneumonia or clinical dehydration, however, because the mother complained that Terrell would not eat or drink, and was not crying tears, he ordered lab work. The doctor stated that he did not check the records from February 7, but instead relied on the history given by the mother and his own physical examination on February 8. He was not aware of any rule that previous records must be checked if a patient is seen in the emergency room on two consecutive days. When cross-examined about this issue, he said he relied on the history given by Ms. Williams, and that she told him she was supposed to return to the emergency room if Terrell’s fever increased, if he cried without tears, or did not urinate. Terrell’s temperature was lower, and the lab work indicated that |1fihe was not dehydrated. Dr. Awotwi testified that he was not .aware that Terrell had been in the emergency room on February 5.
D. Dr. Carl Robinson
Dr. Carl Robinson, the physician defendant in this case, is a board certified pediatrician. He, along with a visiting resident from the Medical Center of Louisiana, treated Terrell on February 7. Dr. Robinson explained that there is a presumption • in an emergency room that the person who brings a child in is going to give all the information necessary to make a proper assessment. Because emergency room doctors see patients on an episodic basis, they have no criteria on which to base a state of normalcy for that patient.
When he saw Terrell on February 7, he was aware that the child had been seen in the emergency room on February 5, but could not recall if he was made aware that blood work was done. He testified that if the emergency room personnel were aware that blood work had been done, the records would have been located. On the 7th, the mother complained that Terrell was still congested, had vomited three times that day, but no longer had diarrhea. He now had ulcers in his mouth that he did not have on February 5. The triage nurse noted that Terrell was crying tears and that his breathing was labored. Dr. Robinson explained that this was likely the result of his crying, because the physical examination of his lungs revealed no congestion or wheezing. He told Ms. Williams to stop giving Terrell the antibiotic prescribed for his ears, because his ears were no longer red. Dr. Robinson was of the opinion that all of Terrell’s problems were viral in nature.
|1fiThe testimony of these experts was in direct conflict. Unfortunately for the plaintiffs, the jury apparently was persuaded by the testimony of defendants’ experts. Expert opinions are not controlling, and any weight given to such opinions by the jury'is dependent upon the expert’s qualifications, experience, and studies upon which his testimony is based. Moore, supra at p. 6, 720 So.2d at 429. Where there are two permissible views of the evidence, the fact finder’s choice between the two cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
*408 The plaintiffs presented the testimony of only one pediatric emergency room physician, Dr. Boulet. It was called to the jury’s attention that Dr. Boulet had been turned down for a job at Children’s Hospital, a fact possibly considered by the jury when determining his credibility. The only other doctors to testify on the plaintiffs’ behalf were two pathologists, neither of whom was qualified in pediatrics or emergency room care.
Conversely, the defendants offered the testimony of Dr. Gavin, board certified in both pediatrics and emergency medicine, who teaches emergency room medicine, and Dr. Hebert, who was qualified as an expert in pediatrics, pediatric emergency medicine, and emergency room operation. Both of these experts explained what they believed to be the standard of care, and opined that the standard was not breached.
Based on the record evidence, we cannot say that the jury’s decision to credit the testimony of the defense experts over that of those called by plaintiffs is |17manifestly erroneous. Because the jury’s verdict is supported by the evidence, the judgment of the trial court must be affirmed.
AFFIRMED

. One member of the panel, Dr. John Gavin, testified that he did not agree with the opinion. He, however, had no explanation for how his signature came to be on the final panel opinion finding a deviation from the standard of care.