675 So.2d 792 (1996)
Kasey MIX
v.
KREWE OF PETRONIUS, First Financial Insurance Company and The City of New Orleans.
No. 95-CA-1793.
Court of Appeal of Louisiana, Fourth Circuit.
May 22, 1996.
*793 Patricia D. Miskewicz, Clyde A. Ramirez & Associates, New Orleans, for Plaintiff/Appellee Kasey Mix.
Avis Marie Russell, City Attorney, Victor M. Ortiz, Assistant City Attorney, New Orleans, for Defendant/Appellant City of New Orleans.
W. Evan Plauche', Hailey, McNamara, Hall, Larmann & Papale, L.L.P., Metairie, for Defendants/Appellants First Financial Insurance Company and The Krewe of Petronius.
Before SCHOTT, C.J., and LOBRANO, ARMSTRONG, WALTZER and LANDRIEU, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Following a bench trial, the district court entered judgment in favor of petitioner, Kasey Mix, and against defendants, the City of New Orleans (City), The Krewe of Petronius (Petronius) and its insurer, First Financial Insurance Company (First Financial) awarding *794 Mix $8,500.00 in general damages, medical expenses of $609.93, lost wages of $176.00, costs and legal interest from the date of judicial demand, and finding Mix to have been free of fault.[1] The defendants appeal the trial court's findings of liability and lack of comparative fault, but do not appeal the amount of damages awarded Mix. We affirm those portions of the judgment holding the City liable and finding Mix free of fault and reverse that portion of the judgment finding Petronius liable.

STATEMENT OF FACTS
The petition alleges that Mix suffered a broken foot when she fell on steps located in the Municipal Auditorium, a facility owned by the City and leased to Petronius at the time of the injury. Mix sued the City, Petronius and its insurer, claiming defendants were negligent and strictly liable for maintaining unreasonably dangerous steps at the Auditorium.
Mix, while a non-paying guest in the Auditorium at a function sponsored by Petronius, fell while returning to her seat after the house lights had been dimmed. The testimony and photographs introduced at trial show that a small light was inset into the front face of the second-to-last step before the landing to partially illuminate the top of the last step before the landing. The steps and the landing were painted the same color. Mix testified that, looking at the partially illuminated top of the last step, she mistook that step for the landing, took a long stride, caught her heel on the last step and fell, twisting and breaking her foot. This testimony was corroborated by Mix's companion.
She claims that the steps were unreasonably dangerous because the recessed light was insufficient to show that the next step was not itself the landing, and that by painting the steps and landing the same color, the City caused a blending or camouflage effect which caused her to miss her step.
The parties presented conflicting expert testimony concerning the comparative safety of the steps.

LIABILITY OF THE CITY OF NEW ORLEANS
The trial court found that the limited lighting and use of the same paint color for steps and landing constituted negligence on the part of the City as owner of the Auditorium and the party responsible for the lighting and painting of the steps. Implicit in this finding is the conclusion that the steps were unreasonably dangerous for their intended use.
In reviewing the judgment below, we apply the manifest error standard.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... [A]ppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.... When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... [Where] a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations *795 and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State, Through Dept. of Transp. and Development, 94-2370 (La. 4/21/95), 654 So.2d 311, 314; Stobart v. State, Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[2], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La. 7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La. 2/20/95), 650 So.2d 742, 745.
Having reviewed the entire record as a whole, we find that the trial court's finding that the steps were unreasonably dangerous is well supported by the record and is not manifestly erroneous.

LIABILITY OF THE KREWE OF PETRONIUS
The petition alleges that Petronius is liable to Mix in the following particulars:
1. failing to provide adequate lighting for guests leaving their seats during the performance;
2. failing to provide escorts and ushers to assist guests moving about the auditorium;
3. failing to inspect the premises for adequate lighting;
4. failing to warn patrons of non-standard, step stairway leading to seating area; and
5. any and all other acts of negligence proven at trial.
Alternatively, Mix contends Petronius was strictly liable because it was in control of the auditorium.
There was no proof of negligence adduced at trial, and the judgment finds Petronius strictly liable to Mix.
PETRONIUS IS NOT STRICTLY LIABLE TO PETITIONER BECAUSE IT WAS NOT A CUSTODIAN WITH "GARDE" OF THE MUNICIPAL AUDITORIUM.
Substantively, Mix's contention that Petronius is strictly liable rests upon a very weak foundation. The jurisprudence supporting lessee strict liability is inapplicable to a lease such as that entered into between the City and Petronius. In order for an owner's strict liability to apply to a lessee or other custodian, there must be a finding that the owner transferred "garde" to the custodian.
In Loescher v. Parr, 324 So.2d 441 (La.1975), the Louisiana Supreme Court found that a tree growing on defendant's lot, which damaged plaintiff's car, was in the lot owner's custody, noting in a footnote:
In Verlander, We are Responsible ..., 2 Tulane Civil Law Forum, No. 2, p. 64 (1974), which contains a perceptive and thorough analysis of the French, Quebecois, and Louisiana interpretations, it is suggested: `(T)he things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them. This relationship will ordinarily be associated with ownership, but the guardianship will also belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairmen, among others. It will not belong to the agent or the mandatory, the employee or the servant, or to anyone else for whom there is a responsible principal.

*796 The owner may transfer the guardianship by transferring the thing to another who will bear such a relationship to the thing as to himself have the care of it. He may also lose the care of this thing, principally by the theft of the thing.' 324 So.2d at fn. 7.
Logically, under Loescher, in order to be liable for the inadequate lighting and painting of the landing, Petronius must have had the "right of direction and control" such as would have allowed it to change the lighting and repaint the landing to provide a visual contrast. Clearly, that was not the case. Applying the Loescher analysis, we conclude that the Auditorium did not bear such a relationship to Petronius that Petronius had "the right of direction and control" over it, and, therefore, Petronius did not have the guardianship envisioned by the Loescher court.
In Akerman v. Dawes, 94-0757 (La.App. 4 Cir. 1/19/95), 658 So.2d 1270, this Court recently held a lessee liable for damages sustained when plaintiff-sublessee fell through a rotten railing. Akerman held that the lessee had "custody" for purposes of strict liability, citing Loescher. The lessee in Akerman, unlike Petronius, had a significant period of possession, during which time it could have or should have become aware of the rotten railing; the lessee also had the type of guardianship envisioned in note 7 to Loescher, whereby it had rights of direction and control and the consequential opportunity to repair.
Burton v. Housing Authority of New Orleans, Inc., 623 So.2d 243, 245 (La.App. 4 Cir.1993), writ not considered, 93-2646 (La. 1/7/94), 631 So.2d 436, also addresses the custody issue. In order for an owner (HANO in that case) to be liable, petitioner was required to show (1) HANO had custody of the apartment; (2) the apartment had an unreasonably dangerous condition; and (3) the unreasonably dangerous condition caused petitioner's injury. With respect to the custody issue, this Court held:
When the owner of an unreasonably dangerous thing transfers physical possession to another, the owner continues to have "custody" (or "garde", to use the French term which is translated imperfectly into English as "custody") within the meaning of Civil Code Article 2317. Ross v. LaCoste de Monterville, 502 So.2d 1026, 1029-32 (La.1987). Similarly, the duty imposed upon the owner of a building by Civil Code Article 2322 is "non-delegable", Olsen v. Shell Oil Co., 365 So.2d 1285, 1293-94 (La.1979) and the owner's liability under Civil Code Article 2322 continues even if the building or part of it is leased. (citations omitted).
Under Burton's reasoning, the City did not relinquish "garde" to Petronius.
In Catalano v. Walgreen's Corp., 470 So.2d 904, 906 (La.App. 4 Cir.1985), Walgreen's operated its drug store pursuant to a lease that provided inter alia that the lessor was responsible for maintenance and repair of the entrance in which petitioner was injured. This Court reversed a directed verdict in favor of Walgreen's and its insurer, holding:
Lessors and lessees cannot contractually insulate themselves from liability as to innocent third parties. As custodian of this building, Walgreen's owed a duty to its customers to ensure their ability to safely walk in and out of their establishment.
As in Akerman, the lease was of substantial duration, and Walgreen's had the sort of guardianship envisioned in note 7 to Loescher.
The concept of "garde" was extensively discussed in Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987), in which Justice Dennis elaborated on the Loescher standard.[3]

*797 ... [W]e conclude that an owner of a thing who transfers its possession, but not its ownership to another, continues to have the garde of its structure and is obliged to protect others from damage caused by structural defects arising before the transfer.... [T]he owner of a thing is in a better position than the innocent victim to guard against the unreasonable risks of structural defects in the thing he owns which arise before he transfers possession of it to another. 502 So.2d 1026, 1029-1032.
Clearly, applying this analysis, the record does not support a finding that the City transferred its "garde" of the Auditorium to Petronius: the lease term was for a matter of hours, rather than months or years, lessee had no opportunity to inspect, re-paint or reconfigure the lighting system, and Petronius had no guardianship that would have given it the right of direction and control of the steps, landing and lighting system.
The term of the lease was from 8 a.m. on Sunday, 3 February 1991 through 11:59 p.m. on Sunday, 3 February 1991, a total of 15 hours and 59 minutes, for which the base rental was $1,300.00. Lessee agreed to surrender the premises at the end of the term "in the same condition as at the date of the commencement of this lease, ordinary use and wear thereof only excepted."
In Article V of the lease agreement, the Krewe agreed:
Lessee shall not injure, mar, nor in any manner deface said premises, and shall not cause or permit anything to be done whereby the said premises shall be in any manner injured, marred or defaced; and will not drive or permit to be driven nails, hooks, tacks, staples, or screws into any part of said building, and will not make, nor allow to be made, alterations of any kind therein. (Emphasis added.)
Clearly, a plain reading of these provisions mandates the conclusion that the City did not transfer "garde" of the premises to the Krewe. Nothing in the lease agreement transfers "garde" of the premises to the Krewe; in fact, the lease, in Article V, requires the Krewe to agree NOT to alter the condition of the steps in question. The lease was prepared by the City, and was presented to the Krewe for signature. There is no evidence that the Krewe was in a position to negotiate any of the terms of the lease. Any ambiguity in the language should, therefor, be construed against the City. In this case, the language is not ambiguous. There is no evidence of an intent on the part of the City to transfer "garde" to the Krewe, and there is clear contractual language barring the Krewe from taking any action that would have prevented Mix's injury under the facts of this case.
THE TRIAL COURT'S FINDING THAT PETRONIUS HAD A DUTY TO INDEMNIFY THE CITY AGAINST THE CITY'S OWN NEGLECT/IMPROPER DESIGN OF THE MUNICIPAL AUDITORIUM IS CLEARLY WRONG.
The trial court in its reasons for judgment concludes that the City is entitled under the lease to be indemnified and held harmless for Mix's damages. The City having failed to assert its rights, vel non, as indemnitee in the proceedings below, this issue was not before the trial court.

COMPARATIVE NEGLIGENCE OF KASEY MIX
Defendants argue that the trial court erred by not apportioning any fault to *798 Mix. The trial court's allocation of fault is a factual determination which cannot be disturbed on appeal absent a finding of manifest error.
Mix testified that she was careful when she returned to her seat, but that in the available light, it appeared to her that the last step was not a step, but was the landing. Mix's expert witness testified to the camouflage effect of the color scheme, which obscured the distinction between the last step and the landing.
In assessing the negligent conduct of the parties, various factors may influence the degree of fault assigned to each:
[1] Whether the conduct resulted from inadvertence or involved an awareness of the danger,
[2] How great a risk was created by the conduct,
[3]The significance of what was sought by the conduct,
[4]The capacities of the actor, whether superior or inferior, and
[5]Any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), quoted with approval in Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289, 294 (La.1993).
We are instructed by the Louisiana Supreme Court to give deference to the trier of fact's allocation of fault:
Regarding the allocation of fault in this circumstance, we adopt the standard set forth in Coco v. Winston Industries, Inc., 341 So.2d [332] at 335 [(La.1976)]. Just like in the quantum area, there is for sure a large amount of uncertainty in the allocation of fault. Our Coco decision pointed out that "The ultimate determination by an appellate court as to whether a given judge or jury abused their `much discretion' as a matter of law is a judgment call." 341 So.2d at 335.
Clement v. Frey, 95-1119, 95-1163 (La. 1/16/96), p. 5, 666 So.2d 607, 609.
Evidently, the trier of fact was persuaded to accept the testimony supporting Mix's position. We find that the record, taken as a whole, supports this conclusion, and that the conclusion is consistent with Louisiana principles of comparative fault. We find no manifest error in the trial court's finding that Mix was free of fault.

CONCLUSION
We affirm the judgment of the trial court insofar as it finds the City of New Orleans liable to Kasey Mix, and finds Kasey Mix to have been free of fault, and reverse insofar as the judgment finds The Krewe of Petronius strictly liable to plaintiff and liable as indemnitor to the City of New Orleans.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
ARMSTRONG, J., concurs in part; dissents in part.
ARMSTRONG, J., concurring in part; dissenting in part.
I concur in the upholding of the judgment against the City but I respectfully dissent from the determination that the lessee was not strictly liable. I do so because, while I am sincerely sympathetic to the majority's position, I feel constrained by decisions of the Supreme Court, as well as several of our own decisions, addressing Article 2317 strict liability. I therefore find no error in the trial court's ruling and would affirm the judgment of the trial court.
The Supreme Court has held that the distinction between negligence and Article 2317 strict liability is that, in strict liability, it is not necessary that the defendant have had any knowledge of the unreasonably dangerous condition which caused the plaintiff's injury. Oster v. State, DOTD, 582 So.2d 1285, 1288 (La.1991). As Article 2317 strict liability may thus be imposed upon a defendant who did not even know of the unreasonably dangerous condition, then it logically follows that Article 2317 strict liability may be imposed upon a defendant who had no opportunity to remedy the unreasonably dangerous condition. One cannot remedy an unreasonably dangerous condition of which one is unaware. Consequently, we previously have *799 held that "the plaintiff [in an Article 2317 case] is relieved of proving any knowledge or notice, actual or constructive, by the custodian, or any failure of the custodian to reasonably keep the thing in repair." Fox v. HANO, 605 So.2d 643 (La.App. 4th Cir.), writ denied, 607 So.2d 570 (La.1992). Accord Elder v. Rowe, No. 95-1599 (La.App. 4th Cir. 3-29-95), 653 So.2d 718, 721. In short, it is the very nature and purpose of Article 2317 strict liability to impose liability upon defendants who had neither actual or constructive knowledge of, nor the opportunity to remedy, an unreasonably dangerous condition.
It is inconsistent with the nature and purpose of Article 2317 strict liability to limit "custody" or "garde" (one of the three essential elements of Article 2317 strict liability) to situations in which the defendant had actual or constructive knowledge of and/or the opportunity to remedy the unreasonably dangerous condition. There can be no Article 2317 strict liability without "custody" or "garde." Oster, 582 So.2d at 1288; Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Thus, if "custody" or "garde" is limited to situations in which the defendant had knowledge of and/or an opportunity to remedy the unreasonably dangerous condition, then Article 2317 strict liability is itself so limited. Such a limitation eliminates the distinction drawn between negligence and Article 2317 strict liability by the Supreme Court's Oster decision and our own Fox and Elder decisions.
Consequently, in the present case, the fact that the lessee may not have had possession of the premises long enough to discover the unreasonably dangerous condition, and the fact that the lessee might not have had the necessary authority under the lease to alter the premises so as to remedy the unreasonably dangerous condition, are facts that are relevant to an analysis of whether the lessee was negligent but not relevant to an analysis of whether the lessee is strictly liable under Article 2317. In fact, in a previous case in which we imposed strict liability upon the lessee of premises, we did not condition that holding upon the length of time of the lessee's possession of the leased premises or upon the lessee's having an opportunity to remedy the unreasonably dangerous condition, when we held that: "As the lessee of the building, Greenblatt had `custody' of the building for purposes of strict liability under Article 2317 of the Civil Code." Akerman v. Dawes, 94-CA-0757 (La.App. 4th Cir. 1-19-95), 658 So.2d 1270, 1272. Consequently, I believe that the Akerman holding is applicable to the present case.
I also note that the lessee obtained liability insurance for its function at the leased premises from defendant First Financial, see Trial Exhibit P-2,[1] and that First Financial was sued by the plaintiff under the Direct Action statute. La.R.S. 22:655. Thus, I believe that it is First Financial, and not the lessee, that is responsible for payment of any judgment against the lessee in this case.
Finally, I note that, with respect to liability of the State and its subdivisions, the Legislature has limited Article 2317 strict liability. La.R.S. 9:2800. See Fox, 605 So.2d at 646. Perhaps legislation could address situations such as that of the lessee in the present case.
NOTES
[1] The City filed a general denial, and did not make any claim against Petronius or its insurer for contractual or other indemnity. At pre-trial, on 9 March 1994, Judge Katz set 22 April 1994 as the deadline for filing incidental demands, supplemental and amending pleadings.
[2] See, LSA-Const. Art. 5, section 10(B).
[3] An owner who transfers to another possession of his thing containing a structural defect continues to have the garde or custody of its structure and a duty to protect others from harm caused by the defect.... According to the French understanding, garde is the obligation imposed by law on the proprietor of a thing or on the one who avails himself of it to prevent the thing from causing damage to others.

When this court first interpreted article 2317 as incorporating a concept of legal fault similar to that represented by article 1384(1) of the French Civil Code, it observed that "the English translation of `sous sa garde' as `in our custody' does not fully express the concept of the `garde' of a thingthe legal responsibility for its care of keepingso that one may lose the custody of a thing without losing its `garde'." (Citations omitted.) Moreover, in Loescher this court quoted with approval a passage from a casenote entitled Things in One's Custody, 43 Tul.L.Rev. 907, 912 (1969) quoting a French legal dictionary as defining garde as:
"Obligation imposed by law on the proprietor of a thing or of an animal or on the one who avails himself of it to prevent this thing or this animal from causing damage to others."
and noted that French doctrinal writers afford the term an even broader definition. Loescher, supra, at p. 447 n. 6.
... Professor Esmein ... explained that "[t]he case law relative to the guardian of an object or of an animal is based on the idea that the person presumed responsible is he who, governing in fact the object or the animal, has by his prudence and skill to prevent an accident. This alone explains why the guard is transferred to a lessee, to one who borrows, etc., and does not remain with the owner, except in the case of responsibility for defects." (Emphasis added.)
[1] On appeal, there was some question as to whether proof of insurance was offered into evidence. Exhibit P-2 shows clearly that it was.