11 JONES, Judge.
Plaintiffs/appellants, Patricia Williams, Anna Solomon and Margaret Lacy, appeal the judgment of the trial court, which awarded each plaintiff general damages in the amount of $28,000, $20,000 and $30,000 respectively. The defendants Wendell Williams and Seven C’s Investments answered the appeal seeking to have the judgment amended to delete Continental Casualty Insurance Company from the list *298 of defendants since it was not a legitimate party to the litigation. After reviewing the record, we amend the judgment to delete Continental Casualty Insurance Company and affirm the judgment as amended.

FACTS

On July 26, 1996, Patricia Williams was operating her 1993 Pontiac automobile when a tractor-trailer driven by Wendell Williams struck her vehicle in the right front quarter near the passenger side door. The incident occurred when Wendell Williams failed to stop for a stop sign on Thayer Street and subsequently struck Ms. Williams’s vehicle. The tractor-trailer was owned by Seven C’s Restaurant, which was doing business as F. Christina Company, Inc., a division of Congra Poultry.
| ¡¿Because neither party disputed liability, the parties proceeded to a bench trial on the issue of damages. Following trial, the trial court found in favor of the plaintiffs, and against the defendants, Wendell Williams, F. Christina & Company and Continental Casualty Insurance Company. The trial court then awarded general damages to the plaintiffs, Patricia Williams, Anna Solomon and Margaret Lacy, in the amounts of $28,000, $20,000 and $30,000, respectively. From this judgment, the plaintiffs filed the instant appeal. The defendants also filed an answer to the appeal, requesting that Continental Casualty Insurance Company be deleted from the judgment because the damages did not exceed the insurance deductible under F. Christina & Company.[1]

INSUFFICIENCY OF DAMAGES

In their sole assignment of error, the plaintiffs argue that the general damage awards were insufficient in light of the extent and duration of their injuries. The defendants, on the other hand, argue that the general damage awards were adequate and consistent with the overall medical condition of each plaintiff following the July 1996 accident. We agree.
Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Courteaux v. State ex rel. Dept. of Transp., 99-0352, 99-0353 (La.App. 4 Cir. 9/22/99), 745 So.2d 91, 98, writ denied, 2000-3214 (La.1/28/00), 753 So.2d 834. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. Id. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable \ evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. King v. Sewerage & Water Bd., 99-0382 (La.App. 4 Cir. 11/24/99), 747 So.2d 200. (Emphasis added). Thus, this Court is limited to the information included in the record when deciding whether the district court was correct in its judgment. Id.

MARGARET LACY

Ms. Lacy, a 55-year-old nurse technician at Methodist Hospital, was positioned in the back seat of Ms. Williams’ vehicle when the collision occurred. She sustained injuries to her neck, lower back, both wrists and shoulders. She also complained of headaches, and pain in her shoulders, neck and back. She underwent treatment with Dr. Essam Elmorshidy, a certified orthopedist, from August 1996 to November 1998, and later continued treatment with Dr. S. Daniel Seltzer after Dr. Elmorshidy was killed in an automobile accident.[2]
*299 Ms. Lacy testified that this was the first time she had experienced severe pain in her wrist. She further testified that her subsequent condition has restricted her duties as a nurse technician, hindered her recreational activities, interfered with her sleep, and had aggravated her asthmatic condition. In conjunction with her claim for general damages, Ms. Lacy claimed damages for loss wages, medical bills and prescriptions.
On cross-examination, Ms. Lacy testified she was also diagnosed with muscular strain in her cervical spine following a 1985 automobile accident. She 14admitted to being treated for acute para cervical muscle strains following a 1993 automobile accident. Ms. Lacy testified that Dr. El-morshidy prescribed three weeks of physical therapy for her in February 1997, but the record indicates that she did not attend therapy until May 1997. Additionally, Ms. Lacy conceded that Dr. Elmorshidy had issued a certificate to her employer indicating that she was able to return to work because she “had recovered sufficiently to be able to return to work.”
Although she recalled twisting her arm and hand during the impact, Ms. Lacy did not inform Mr. Elmorshidy about the pain in her hands or wrists during his first physical examination in August 1996. In fact, the patient medical history form, which she filled out one week after the accident, reflects that Ms. Lacy did not strike her hand or wrist on any object in the car. It also states that she had her seatbelt on at the time of the impact. Even though Dr. Seltzer recommended future surgery to her right wrist, Ms. Lacy testified that Dr. Seltzer did not examine her right wrist when she initially complained about wrist pain in December 1998. Her testimony at trial also contradicted her deposition testimony in which she stated that she did not have any complaints with her right hand.

a. Plaintiffs’ Expert Witness

Dr. Seltzer, the plaintiffs’ expert witness in orthopedics, testified that Ms. Lacy’s medical records indicated that she had consistent complaints of muscle spasms in her cervical and lumbar spines during her treatment with Dr. Elmorshidy. According to Dr. Seltzer, Dr. Elmorshidy took X-rays of Ms. Lacy’s neck and back, prescribed a neck, back and a wrist brace for her to wear everyday, and he issued several prescriptions for pain medication.
1 RPr. Seltzer also testified that approximately six months after the accident, Dr. Elmorshidy diagnosed Ms. Lacy with bilateral carpal tunnel syndrome after she complained to him about the “excruciating” pain she was encountering in her wrist. Therefore, in April 1998, Ms. Lacy underwent carpal tunnel surgery on her left hand at Methodist Hospital. Following the surgery, Dr. Elmorshidy diagnosed Ms. Lacy with subligamentous herniation of the C3-C4 disc and mid-line posterior herniation of the C4-C5 disc.
When Dr. Seltzer began treating Ms. Lacy following Dr. Elmorshidy’s death, he reviewed her medical records and concurred with Dr. Elmorshidy’s findings. He also assessed her an anatomical disability rating of 15% for the cervical injury, and 10% disability rating for the lumbar injury. Since Dr. Seltzer testified that Ms. Lacy’s herniated disc was a permanent condition, he restricted her from activities which would require her to lift more than 15 pounds, extend her neck for prolonged periods of time, or repeat various types of manipulative functions with her hands. He also noted that Ms. Lacy had intrinsic knee problems, which could make her a candidate for arthroscopic surgery in the future if her condition persisted. He further determined that Ms, Lacy was in need of additional surgery on her left wrist, which he estimated to be approximately $15,000 in future medical costs.
*300 On cross-examination, Dr. Seltzer admitted that Ms. Lacy’s neurological examination did not reveal any abnormalities in her right hand. He found no active spasms in Ms. Lacy’s neck or back, and her cervical and lumbar spine showed a fair range of motion. Thought there was generalized muscular tenderness in the lumbar spine, Dr. Seltzer was not able to relate his findings to the accident. In fact, there were no clinical findings that would indicate that Ms. Lacy would be in need |fiof future medical attention to her neck, back or right hand. Finally, Dr. Seltzer conceded that the results of Ms. Lacy’s physical examination and MRI film of her neck and back were normal for someone in her age category.

b. Defense’s Expert Witness

Dr. Edmond Landry, a board certified orthopedist for over 18 years, testified for the defense that Ms. Lacy had a full range of motion in her neck at the time of his examination. He testified that Ms. Lacy was not wearing her cervical brace at the time of his examination. Dr. Landry also found no evidence of muscle spasms or tenderness in her neck, back or right hand. Dr. Landry testified that Ms. Lacy’s neurological exam was normal in both the upper and lower extremities. In addition, he did not find any atrophy (degeneration) in her arms, hands, or thighs.
Even though Dr. Landry discovered some anterior spurring at the L3 vertebral body, he concluded that this condition was a degenerative change consistent with individuals in Ms. Lacy’s age category. He also determined that the spurring could not have resulted from the July 1996 accident because it takes at least 18 months for the spurring in the lumbar spine to occur. Because he was unable to find any abnormalities in either the cervical or lumbar spine, Dr. Landry opined that Ms. Lacy had a soft tissue injury, which would not require additional orthopedic treatment.
Dr. Landry also opined that Ms. Lacy’s carpal tunnel surgery was unrelated to the July 1996 accident. He examined both of Ms. Lacy’s wrists and found that her wrist had full ranges of motion, there was no muscle atrophy in her hands and her symptoms were fairly minimal in nature. He later testified that her condition was probably some form of circulatory dysfunction. Additionally, Dr. Landry concluded that Dr. Elmorshidy’s description of Ms. Lacy’s condition as an |/‘internal disruption of the L4-L6 disc architecture,” was actually a reference to degenerative changes in her body.
Although, on cross-examination, Dr. Landry conceded that Ms. Lacy exhibited some degenerative changes in her right leg which could have been the result of nerve root impingement; however, he declined to attribute Ms. Lacy right leg complaints to the accident. Dr. Landry conceded that Ms. Lacy was wearing her lumbar brace when he examined her in July 1997. He also admitted that Dr. Elmorshidy found muscle spasms in Ms. Lacy’s back on every visit.
Additionally, Dr. Daniel Scullin, the defense’s expert in the field of radiology testified that Ms. Lacy’s spinal cord was normal even though he noted a slight diffused bulge at the C3-C4 level in her cervical spine. Though Dr. Scullin declined to classify the bulge as a herniated disc, he did testify that the bulge was a common occurrence for individuals in the same age group as Ms. Lacy. Dr. Scullin further testified that the bulge pre-existed the July 1996 accident.

ANNA SOLOMON

Ms. Solomon, a 62-year-old housekeeper, was located in the front passenger seat when the incident occurred. Following the accident, she testified that she injured her neck, back, shoulder and the right side of her hip. Ms. Solomon also testified that she hit her head during the collision, but she refused medical attention while at the scene of the accident because she exhibited no symptoms following the *301 impact. However, later that evening, she testified that she started having “severe” pain in her back and a “stinging” sensation in her neck. Ms. Solomon testified that she rubbed her body with alcohol and took over the counter pain | ¡^medication to treat the pain. She testified that this was the first time she made a claim for personal injuries even though a bus hit her in 1971.
On August 2, 1996, Ms. Solomon testified, she began treatment with Dr. El-morshidy, an orthopedist, after her attorney had scheduled an appointment for her. Dr. Elmorshidy examined her neck, back and shoulders, wrote a prescription for pain medication, and ordered a back brace and a body support suit for her to wear. Ms. Solomon testified that she wore the back brace and body support everyday and continued treating with Dr. Elmorshidy every four to six weeks.
Following her appointment with Dr. El-morshidy, Ms. Solomon testified that she began experiencing severe pain in her neck twice a week for at least fifteen minutes. However, she described her back pain as more frequent — at least once a day — and more severe than her neck pain. Ms. Solomon testified that her back pain prohibited her from standing or sitting for long periods of time, and she testified that her back pain would radiate down her right leg on several occasions.
Dr. Elmorshidy later ordered a MRI after Ms. Solomon continued to complain about the pain in her back. She testified that Dr. Elmorshidy informed her that the results from her MRI revealed that her spine was “bad.” Ms. Solomon continued using the over-the-counter pain medication as well as the other prescriptions Dr. El-morshidy had prescribed. She also continued her treatment with Dr. Elmorshidy every four to six weeks until Dr. Seltzer took over the treatments. Ms. Solomon testified that her injuries prohibited her from playing sports with her grandchildren and participating in church activities.
On cross-examination, Ms. Solomon admitted that she received a majority of her medical services at the Medical Center of Louisiana (formerly Charity Hospital) pri- or to the accident, but failed to go to the Medical Center when she first 19developed pain in her neck and back. Ms. Solomon conceded that she went to the Medical Center at least thirty times following the accident; however, she failed to inform the physicians at the Medical Center that she was involved in an automobile accident or that she injured her neck and back in the collision. In fact, when the physicians at the Medical Center recommended that she walk at least 30 minutes a day to lower her cholesterol, Ms. Solomon admitted that she did not tell them that she was having problems walking for long periods of time.
Despite her consistent neck and back pain, Ms. Solomon testified that she only refilled her pain medication twice because the medication irritated her stomach. She testified that Dr. Elmorshidy did not prescribed additional pain medication, but instead began giving her cortisone injections, which she admitted were only administered once every six months.
Though she admitted that she continued using over-the-counter medication to treat the pain, the receipts for those purchases were not given to her attorney and were not made a part of the record in this case. In fact, the record indicates that Ms. Solomon’s neck complaints had started to subside following her December 9, 1996, visit with Dr. Elmorshidy. Further, there was no indication in the record to suggest that Ms. Solomon was actually prevented from doing any activity that she was doing prior to the accident.

a. Plaintiff’s Expert Witness

Following an examination on August 2, 1996, Dr. Elmorshidy[3] diagnosed Ms. Sol *302 omon with moderate spasm and tenderness in the lumbar area, with limited range of motion. He described the straight leg test as painful for a patient past 60 | indegrees. Though the X-rays of Ms. Solomon’s cervical spine were normal, Dr. Elmorshidy detected a bulging disc at the C5-C6 level with a mild strain. On the other hand, the X-rays of her lumbar spine showed signs of muscle spasms.
Dr. Elmorshidy began treating Ms. Solomon with Theragesic cream, Naprosyn and a lumbar corset. He also gave her cortisone injections for the pain in her neck. Dr. Seltzer concurred with Dr. El-morshidy’s findings and later assessed her with a 10% whole body disability. He also restricted Ms. Solomon from lifting more than 15 pounds, and he restrained her from stooping or crouching for extended periods of time.
On cross-examination, Dr. Elmorshidy testified that during his second visit with Ms. Solomon, he noted that Ms. Solomon’s neck had improved even though her cervical MRI showed that she had a bulging disc. He also conceded that Ms. Solomon did not have a “major” neck problem, but rather a soft-tissue injury to her neck, which started to improve after a few months of treatment. As it relates to the MRI findings, Dr. Elmorshidy testified that he usually assigns a 90% accuracy rating to MRI readings because there is usually a discrepancy between MRI film and the results of a patient’s objective tests. He also noted that Ms. Solomon was still asymptomatic on her last visit.
Though Dr. Elmorshidy placed several restrictions on Ms. Solomon’s activities, he testified that a majority of what he discusses with a patient is not reduced to a patient’s medical records. All of Ms. Solomon’s neurological examinations were normal and Dr. Elmorshidy attributed her knee complaints to normal degenerative changes in her body. Dr. Elmorshidy did not assess her with a disability rating, and he did not recommend future surgery.
InDr. Seltzer also conceded that Ms. Solomon was asymptomatic with respect to her neck at the time of her visit with him. Although Ms. Solomon complained of pain in her neck and back, Dr. Seltzer did not conduct an independent examination of her neck, and he did not question the severity of the pain she was experiencing. In fact, Dr. Seltzer testified that his records only reflected what Ms. Solomon told him during the examination. Dr. Seltzer admitted that Ms. Solomon’s straight leg test was normal, and the bulge he detected at the C5-C6 level was normal for individuals in her age group. While Ms. Solomon’s cervical spine did show a mild decrease range of motion, he did not prescribe any additional pain medication for her neck pain.

b. Defense’s Expert Witnesses

Dr. Landry’s physical examination of Ms. Solomon’s neck and back revealed that she had tenderness in the right paraverte-bral muscle with no spasm or masses. He also found tenderness in her lumbar spine in the L4-S1 area. Ms. Solomon’s straight leg test was negative, and she had a full range of motion in her right hip. Her neurological examination did not show any abnormalities in either her cervical or lumbar spines. However, Ms. Solomon’s X-rays showed degenerative changes in her lumbar spine — small osteocytes or bone spurs, which are associated with arthritis.
From his examination, Dr. Landry concluded that Ms. Solomon did not exhibit any abnormalities or spinal stenosis (nerve root compressions) in either her cervical or lumbar spines. Dr. Landry did not find any signs of an on-going injury, and he did not opine that Ms. Solomon was in need of further medical treatment.
On cross-examination, Dr. Landry conceded that his diagnosis of Ms. Solomon was derived after having only two meetings with her prior to trial.
| iaDr. Daniel Scullin a board-certified radiologist, testified that he reviewed Ms. Solomon’s X-rays and concluded that Dr. Johnson’s diagnosis of a broad-based pro- *303 trusión at the C5-C6 level for Ms. Solomon was actually a term that is synonymous with a diffused bulge in her lumbar spine. According to Dr. Scullin, a diffused bulge in the lumbar spine results from degenerative changes in the body — not from trauma. Moreover, Dr. Scullin testified that he did not find a protrusion in Ms. Solomon’s lumbar spine, but he found that there was mold inflammation in her cervical spine. Nevertheless, Dr. Scullin testified that Ms. Solomon’s injuries actually pre-existed the July 1996 accident. On cross-examination, Dr. Scullin admitted that it was possible for Ms. Solomon to experience pain in her neck and back even though her MRI and X-rays showed no abnormalities.

PATRICIA WILLIAMS

Ms. Williams, who was 41 years old at the time of trial, was the owner and driver of the 1993 Pontiac. She sustained injuries to her neck, back and right foot. She testified that she consistently had muscle spasms in back and neck when she met with Dr. Elmorshidy. Notwithstanding the pain in her neck and right foot, Ms. Williams described the pain in her back as more severe than in the other areas. She received several cortisone, steroid and Xy-locaine injections to relieve the pain, and she was given analgesic balm and a lumbar corset for her back. Ms. Williams testified that she wore the back brace during work and at night.
Ms. Williams also testified that she experience a lot of pain in her back during work because her occupation as an assistant manager for a car rental company requires her to sit for long periods of time while doing paperwork. She | ^testified that she has trouble walking long distances, and on several occasions, she testified the pain would travel down her leg.
On cross-examination, Ms. Williams admitted that she did not wear her back brace when Drs. Landry and Seltzer examined her. She also admitted that she did not received medical attention at the scene of the accident and did not consult with a physician until she was referred to Dr. Elmorshidy by her attorney — approximately one week after the accident. The record indicates that directly following the accident, Ms. Williams drove her vehicle from Opelousas Avenue in Algiers to a Pontiac dealership on Veterans Memorial Boulevard in Metairie. Moreover, despite the collision just hours before, Ms.' Williams testified that once she left the Pontiac dealership, she drove to her house in LaPlace.
Although she did not seek any medical attention while in LaPlace, Ms. Williams testified that she was able to drive herself to eastern New Orleans to Dr. Elmorshi-dy’s office after getting a referral from her attorney. The record further reflects that in 1997 Ms. Williams missed seven appointments with a New Orleans physical therapist to whom Dr. Elmorshidy referred her. She also missed four appointments in 1998. Ms. Williams admitted that she did not request Dr. Elmorshidy to refer her to a physician or a physical therapist in LaPlace even though she testified that she missed several appointments with the physical therapist because she was unable to travel long distances to meet with the physical therapist.

a. Plaintiffs Expert Witnesses

Dr. Elmorshidy’s physical examination revealed that Ms: Williams had moderate muscle spasms in her back with tenderness and limited motion. Her straight leg test was 50% normal; however, the X-rays of her cervical spine |ushowed cervical lordo-sis (abnormal curvature of the spine forward), which Dr. Elmorshidy opined was due to the muscle spasms. Ms. Williams also had consistent muscle spasms in her neck and weakness and loss of sensation in her right foot. Because of her consistent complaints of pain in her neck and back, Dr. Elmorshidy prescribed Naprosyn and advised her to massage with Theragesic cream. Approximately two months later, Dr. Elmorshidy gave Ms. Williams a Xylo-caine shot to relieve the pain. When the *304 muscle spasms continued, Dr. Elmorshidy gave Ms. Williams a cortisone injection in her back.
In December 1997, Dr. Elmorshidy referred Ms. Williams to Clearview Imagining for a MRI of her cervical spine. Dr. Daniel Johnson, the radiologist at Clear-view Imaging, diagnosed Ms. Williams with a subligamentous herniation of the C4-C5 disc and a bulge at the C6-C7 level. A diminished sensation in Ms. Williams’ right foot was detected and an epidural steroid injection was administered. The record further indicates that the results from Ms. Williams’ straight leg test became progressively worse.
On cross-examination, Dr. Elmorshidy conceded that the changes at the C5, C6 and C7 levels either pre-existed the 1996 automobile accident or stemmed from degenerative changes in Ms. Williams neck and back. He also admitted that Ms. Williams’ injuries were more than likely soft tissue injuries to her cervical and lumbar spines. In fact, Dr. Elmorshidy testified that Ms. Williams’s neck had substantially improved on September 25, 1996. Dr. Elmorshidy placed several restrictions on Ms. Williams’ activities, but he did not issue a Certifícate of Disability to her employer because Ms. Williams did not indicate to him that she was having difficulty performing her duties at work.
|,5When Dr. Seltzer began treating Ms. Williams in December 1998, he reviewed Dr. Elmorshidy’s records, and concurred with his findings. Additionally, he noted that Ms. Williams had a bulge at the L4-S1 disc, and he concluded that she was entitled to 10-15% whole body impairment as a result of the herniated cervical disc. Despite the consistent muscle spasms, Dr. Seltzer continued with the treatment that Dr. Elmorshidy recommended because Ms. Williams was very adamant about having surgery — even though he classified her injuries as permanent with a possibility of getting worse.
On cross-examination, Dr. Seltzer admitted that his diagnosis was based solely on his review of Dr. Elmorshidy’s medical records. Dr. Seltzer did not review the medical records from Drs. Landry, Johnson, or Scullin when making his diagnosis. Dr. Seltzer also admitted that Ms. Williams did not directly tell him that she was still having problems with her neck and back when she met with him in December 1998 — he just assumed that she was still having problems in those areas.
Dr. Seltzer conceded that Ms. Williams’ muscle strength, reflexes and coordination in the upper extremities as well as her neurological examination were normal. He found that Ms. Williams’ thoracic spine was normal, and there was no curvature in her cervical spine. The only abnormality he was able to detect in her cervical spine was a “mild” limitation of motion. Dr. Seltzer found that the range of motion in her hips, ankles, knees and feet were also normal. Further, he conceded that there was no evidence of nerve dysfunction in the L4-S1 level. Even though he noted a bulge in the L4-S1 area, Dr. Seltzer did not think the bulge was unusual for someone in Ms. Williams’ age group. Finally, Dr. Seltzer admitted that Ms. Williams was not consistent in attending her appointments.
Iifih Defense’s Expert Witnesses
In August 1997, Dr. Landry examined Ms. Williams and found that Ms. Williams’ neck was normal, and there were no abnormalities in her back. However, the X-rays of her neck indicated some early degeneration with small osteocytes or bone spurs. Dr. Landry did not find a bulge at the L4-S1 level, and he found no clinical evidence that Ms. Williams had a herniated disc or nerve root compression in her neck or back. In fact, Dr. Landry testified that six months prior to trial there wei*e no abnormalities in Ms. Williams’ neck or back — except for degenerative changes that occurred prior to the accident in question.
On cross-examination, Dr. Landry admitted that Ms. Williams stated that she *305 had difficulty sleeping, continued to complain of pain in her right buttock and lower back. He also conceded that her straight leg test showed decreased range of motion; therefore, he recommended that Ms. Williams go to a physical therapist to strengthen her lumbar muscles.

STANDARD OF REVIEW

In its Reasons for Judgment, the district court determined that the plaintiffs’ testimony, medical records, and the subsequent evaluations by the defense’s experts did not support a higher general damages award. In essence, the district court based its general damages award on the credibility of the testimony and the documentation offered at trial. In the instant case, we find no error on the part of the district court.
Where there are two permissible views of evidence, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong; however, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was reasonable. See Schlesinger v. Herzog, 95-1127, 95-1128 (La.App. 4 Cir. 4/3/96), 672 So.2d 701, writ denied 96-1328 (La.10/4/96), 679 So.2d 1381; see also Ortego v. Jurgelsky, 98-1622 (La.App. 3 Cir. 3/31/99), 732 So.2d 683. Credibility determinations are subject to the strictest deference and the manifest error-clear-wrong standard demands great deference to the findings made by the factfinder, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. In re Asbestos Plaintiffs v. Bordelon, Inc., 96-0525 (La.App. 4 Cir. 10/21/98), 726 So.2d 926, decision clarified on rehearing; Roger v. Dufrene, 97-1946 (La.App. 4 Cir. 9/9/98), 718 So.2d 592; Mix v. Krewe of Petronius, 95-1793 (La.App. 4 Cir. 5/22/96), 675 So.2d 792.
Having found that there exist several material differences between the diagnoses of the experts in each of the plaintiffs cases, we find that it was not error for the district court to render its decision based upon the testimony of defense’s expert witnesses. However, we also amend the judgment to delete Continental Casualty Insurance Company as a defendant since the damages at issue did not exceed the two million dollar deductible under the defendants’ insurance policy.

DECREE

For the foregoing reasons, we amend the judgment to delete Continental Casualty Insurance Company as a defendant in this lawsuit, and affirm the judgment as amended. All costs are to be paid by the appellees.

AMENDED AND AFFIRMED AS AMENDED.

. The defendants argue that Congra had a two million-dollar deductible on its commercial policy with Continental. Therefore, since the amount awarded to the plaintiffs was less than the deductible, the defendants contend that Continental should not have been included in the lawsuit.

. Plaintiffs’ attorney referred all three women to Dr. Elmorshidy for treatment, and upon *299 Dr. Elmorshidy’s death they all continued treatment with Dr. Seltzer.

. The information concerning Ms. Solomon’s treatment was derived from Dr. Elmorshidy's deposition on June 3, 1998.